

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-22-1997

# Hawksbill Sea v. FEMA

Precedential or Non-Precedential:

Docket
96-7661

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation
"Hawksbill Sea v. FEMA" (1997). *1997 Decisions.* Paper 225.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/225

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 22, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-7661

HAWKSBILL SEA TURTLE; GREEN SEA TURTLE
(CHELONIA MYDAS); VIRGIN ISLANDS TREE BOA
(EPICRATES MONENSIS GRANTI); JEFFREY WEISS;
DAVID A. BRENER; ALAIN M. BRIN; GARY E. BRIN;
ROBERT COCKAYNE; SALLY COCKAYNE; ROBIN
COCKAYNE; FRANK DALY; ANNETTE DALY; JOAN E.
DELUGO; DOROTHY DRUMMEY; EASTWIND
ASSOCIATION; JANET EGBERT; W. HOUSTON EVAN, II;
WALTER FEDDERSEN; DEBORAH FOSTER; RICHARD
FOSTER; JOHN FREEMAN; PATRICIA FREEMAN; BONNIE
GRAY; SANFORD GRISHMAN; LISA GAYE HALL; IVERINE
HEDRINGTON; HARRY ILLINGWORTH; KIMBERLY JONES;
GREGORY JOSEPH; SUSAN KARDYS; NELSON KELLER;
ANDREA KING; CRAIG LUCAS; ANDREW MARON; CATHY
MARON; PAUL V. MAYNARD, M.D.; ROSALYN MOSS;
WILLIAM MOSS; JO NORTON; LARRY NORTON; DR.
MAXINE A. NUNEZ; EDMOND G. RAWSON, III; SUSAN
RAWSON; ROBERT M. PETERSEN; PAIGE SANTIAGO
PASSANO; MAXINE LAVITT; JOSEPH SELFRIDGE; ERIC
SOLDIEW; ELLEN STEWART; CLARE TYSON; JOHN T.
WAGNER; DELORES WAGNER; RUSSELL WHITE

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY,
An Agency of the United States of America;
WITT, JAMES LEE; DEPARTMENT OF INTERIOR,
An Agency of the United States of America;
BABBIT, BRUCE, Secretary of the Interior

THE HAWKSBILL SEA TURTLE (ERETMOCHELYS
IMBRICATA); THE GREEN SEA TURTLE (CHELONIA
MYDAS); THE VIRGIN ISLANDS TREE BOA (EPICRATES
MONENSIS GRANTI); A. JEFFREY WEISS; DAVID A.
BRENER; ALAIN M. BRIN; GARY E. BRIN; ROBERT
COCKAYNE; SALLY COCKAYNE; ROBIN COCKAYNE;
FRANK DALY; ANNETTE DALY; JOAN E. DELUGO;
DOROTHY DRUMMEY; EASTWIND ASSOCIATION; JANET
EGBERT; W. HOUSTON EVANS, II; JANE FEDDERSEN;
WALTER FEDDERSEN; DEBORAH FOSTER; RICHARD
FOSTER; JOHN FREEMAN; PATRICIA FREEMAN; BONNIE
GRAY; SANFORD GRISHMAN; LISA GAYE HALL; IVERINE
HEDRINGTON; HARRY ILLINGWORTH; KIMBERLY JONES;

GREGORY JOSEPH; SUSAN KARDYS; NELSON KEELER; ANDREA KING; CRAIG LUCAS; ANDREW MARON; CATHY MARON; PAUL V. MAYNARD, M.D.; ROSALYN MOSS; WILLIAM MOSS; JO NORTON; LARRY NORTON; DR. MAXINE A. NUNEZ; EDMOND G. RAWSON, III; SUSAN RAWSON; SHARON J. PETERSEN; ROBERT M. PETERSEN; PAIGE SANTIAGO-PASSANO; MAXINE LAVITT-SAWYER; JOSEPH SELFRIDGE; ERIC SOLDIEW; ELLEN STEWART; CLARE TYSON; JOHN T. WAGNER; DELORES WAGNER; RUSSELL WHITE,
        Appellants

On Appeal From the District Court
of the Virgin Islands (Division of
St. Thomas and St. John)
(D.C. Civ. No. 96-cv-00114)

Argued April 8, 1997

Before: BECKER, ROTH, and WEIS, Circuit Judges.

(Filed September 22, 1997)

2

        A. JEFFREY WEISS, ESQUIRE
         (ARGUED)
        A.J. Weiss & Associates
        4002 Raphune Hill Road, Suite 3
        Charlotte Amalie, St. Thomas
        U.S. Virgin Islands 00802

        JAMES DOUGHERTY, ESQUIRE
        709 3rd Street, S.W.
        Washington, D.C. 20024

        Attorneys for Appellants

        LOIS J. SCHIFFER, ESQUIRE
        Assistant Attorney General
        JAMES A. HURD, JR., ESQUIRE
        United States Attorney
        STANLEY L. de JONAGH, ESQUIRE
        Assistant United States Attorney
        St. Thomas V.I. 00802

        J. CAROL WILLIAMS, ESQUIRE
        MARK A. BROWN, ESQUIRE
        M. ALICE THURSTON, ESQUIRE
        PETER A. APPEL, ESQUIRE
         (ARGUED)
        MARTIN W. MATZEN, ESQUIRE

Attorneys, Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

LOIS E. PILGRIM, ESQUIRE
  (ARGUED)
Housing Authority of the Virgin
 Islands
402 Annas Retreat, P.O. Box 7668
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00801

3

JORDAN S. FRIED, ESQUIRE
DAVID A. TRISSELL, ESQUIRE
Office of General Counsel
FEMA
Washington, D.C. 20472

SEAN SKAGGS, ESQUIRE
Department of the Interior
Office of the Regional Solicitor
Southeast Region
Atlanta, GA 30303

Attorneys for Appellees

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal from an order of the district court denying injunctive relief under the Endangered Species Act ("ESA"), 16 U.S.C. S 1536 et seq., presents a number of interesting questions under the ESA and under the law of collateral estoppel. The plaintiffs, who include (by their popular names) the Hawksbill Sea Turtle, the Green Sea Turtle, and the Virgin Islands Tree Boa, which are endangered or threatened species, and also a number of individuals who own real property and reside in the vicinity of Vessup Bay in the east end of St. Thomas (the habitat of these species), filed suit to enjoin the construction of a temporary housing project in nearby Estate Nazareth. The project was a hurried response to the devastation wrought by Hurricane Marilyn, which struck St. Thomas in December 1995 and displaced many people from their homes. The gravamen of the complaint is that the project would cause harm to the turtles and the Tree Boa species in violation of the ESA.

This is the plaintiffs' second lawsuit. In theirfirst action,

see Virgin Islands Tree Boa v. Witt, 918 F. Supp. 879 (D.V.I. 1996), plaintiffs alleged that the Federal Emergency Management Agency ("FEMA"), the United States Fish and Wildlife Service ("FWS"), and instrumentalities of the Virgin Islands Territorial Government had violated the ESA as well

4

as the National Environmental Policy Act ("NEPA") because they had failed to follow specific procedures which are designed to ensure that the relevant governmental actors had adequately considered the risks that the housing project threatened to inflict on the Tree Boa and the marine environment of Vessup Bay during the planning and construction phase.

The case was assigned to Judge Finch, who held an evidentiary hearing held in late January 1996. In a written opinion, Judge Finch found that there was no clear evidence that Tree Boas actually inhabited the project site or that the project site was the source of sedimentation run-off into Vessup Bay. Also satisfying himself as to the adequacy of FEMA's proposed mitigation measures, he concluded that defendants had satisfied their duties under the ESA and NEPA, and denied plaintiffs' request for preliminary injunctive relief. With respect to plaintiff's ESA claims, Judge Finch did not address the substantive requirements of S 9 of the Act, holding only that with respect to the procedural requirements of S 7, the defendants had engaged in the requisite consultation process so as to "fulfill their duty to safeguard the future of the Tree Boa." Judge Finch alternatively found that he felt compelled to dismiss the ESA claims for failure to satisfy the statute's notice requirements, and we affirmed. See Virgin Islands Tree Boa v. Witt, 82 F.3d 408 (3d Cir. 1996) (table).

Plaintiffs then discontinued that action and instituted the present action, which is against the federal defendants only, still seeking to enjoin the construction and occupation of the housing project. See Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1195 (D.V.I. 1996). In the new action, plaintiffs sought injunctive relief only under the ESA, alleging that, in providing the temporary housing shelters, defendants had violated the procedural requirements of S 7 and the substantive requirements of S 9, thereby causing irreparable harm not only to the endangered Tree Boa but also to the endangered Hawksbill Sea Turtle and the threatened Green Sea Turtle. Judge Brotman, to whom the matter was reassigned following Judge Finch's recusal, held a hearing in early August 1996 and received substantial

evidence in addition to that taken by Judge Finch, including new and qualitatively different evidence that was favorable to plaintiffs.

At the threshold, Judge Brotman decided that, with regard to the turtles, plaintiffs had not satisfied the requirements of the ESA that notice be given to the appropriate cabinet officer, which is a prerequisite to their right to sue. Additionally, Judge Brotman gave preclusive effect to the factual findings made by Judge Finch in the previous action, relying extensively on Judge Finch's finding that FEMA's mitigation measures were adequate to protect the Tree Boa and the marine environment of Vessup Bay. Then, basing his decision almost entirely on Judge Finch's findings and not on the significant new evidence that he had received, Judge Brotman concluded that plaintiffs had not shown a likelihood of success on the merits of their ESA claims or irreparable harm to the species they sought to protect because "[w]ith the mitigation measures in place, the temporary housing project at Estate Nazareth will not affect adversely the Tree Boa, the Hawksbill Turtle, the Green Sea Turtle, or these animals' habitats." Id. at 1210. He denied preliminary injunctive relief, and plaintiffs now appeal.

As an initial matter, this appeal requires us to determine whether satisfaction of S 11 of the ESA, 16 U.S.C. S 1540(g), is a prerequisite to plaintiffs' suit with respect to the turtles because the plaintiffs failed to notify the Secretary of Commerce of their intent to sue sixty days before filing this action. Under the ESA and the regulations promulgated thereunder, the Secretary of Commerce must be notified of claims concerning endangered sea turtles in a marine habitat. The plaintiffs had given notice of their suit only to the Secretary of the Interior, whom the ESA and its regulations requires to be notified of claims concerning harm to sea turtles in a terrestrial habitat. Plaintiffs submit that the duplicitous notice requirements are not only fatuous, particularly with respect to the Hawksbill Sea Turtle which occupies both habitats and surely does not know when it crosses from the jurisdiction of the Secretary of Commerce to that of the Secretary of the Interior, but also extraordinarily difficult to decipher given the complexity of the regulatory scheme.

We acknowledge the difficulty that the public must have

in understanding the highly technical nature of the statutory scheme, quite forcefully elucidated in Judge Roth's dissent. However, S 11 and its accompanying regulations still must be given effect, and as we read them, they mandate that, with respect to the turtles, notice to the Secretary of Commerce was required before filing suit. Plaintiffs, who were represented by counsel at all times, failed to comply with this requirement. On this basis, the district court noted that, even if plaintiffs could establish sufficient evidence to merit the issuance of injunctive relief as to the Hawksbill and Green Sea Turtles, "this court would dismiss these claims for failure to comply with the ESA's notice requirement." 939 F. Supp. at 1203. Although the district court did not formally dismiss plaintiffs' claims with respect to the sea turtles, it should have done so.

We next consider plaintiffs' challenges to the district court's denial of injunctive relief. The foremost consideration here is whether Judge Brotman erred in giving preclusive effect to Judge Finch's factual findings in determining whether to grant injunctive relief to the plaintiffs. Plaintiffs assert that, because a preliminary injunction proceeding is not "final," findings made in the course of such a proceeding are not entitled to preclusive effect. They also contend that, with respect to their ESA claims, because Judge Finch provided alternative holdings in support of his decision, any findings relating to those claims are dicta and cannot support collateral estoppel. Additionaly, they claim that, since the issues actually litigated in the first proceeding pertained to NEPA violations, not ESA violations, there were not identical issues present here and hence there is no basis for preclusion. Finally, plaintiffs submit that, irrespective of the operative statutory authority, Judge Brotman was presented with new and qualitatively different evidence from that which was before Judge Finch, so that Judge Finch's findings of fact were limited to the time of the first hearing and could not appropriately be given preclusive effect.

We do not agree that factual findings established in cognate prior litigation can never be given preclusive effect.

However, because Judge Finch's findings made with respect to plaintiffs' ESA claims were clear dicta, they can not support the application of collateral estoppel. To be sure, some factual findings, made with respect to the NEPA claims, might have merited the application of collateral estoppel had they been addressed to a contemporaneous ESA claim. However, plaintiffs' second suit presented a new

and significantly different factual setting, such that Judge Finch can not be said to have decided the same issues as were presented by plaintiffs' second action. More specifically, in the six months that lapsed between the two proceedings, plaintiffs discovered quantitatively different evidence of live, injured, and dead Tree Boas near the project site, in contrast to Judge Finch's findings that no Tree Boas existed on the project site. This finding had driven his conclusion that the mitigation measures were adequate to "safeguard the future of the Tree Boa."

Under these circumstances, it was incumbent upon Judge Brotman to ground his findings on the new evidence. We also note that, in making his findings, Judge Finch had credited the defendants' representation that the housing project was temporary in nature, and he reviewed mitigation measures that were designed for a project of six months duration. However, by the time of the evidentiary hearing before Judge Brotman, the project had been under construction for eight months, and defendants had represented to the court that the project was now expected to last up to eighteen months past the completion of construction. In sum, Judge Brotman erred when he decided that Judge Finch's findings barred relitigation of the factual issues presented by plaintiffs' claims.

This result is buttressed by the impact of the current serious adverse financial condition of the Virgin Islands Housing Authority ("VIHA"). It is now clear that the project is in limbo, as there are insufficient funds to continue construction or to take it down.[1] These pragmatic factors

_____

1. See The Virgin Islands Daily News, July 1, 1997 (reporting the statement of VIHA Director Conrad Francois at a Senate Hearing that the agency is nearly bankrupt; that it owes $1.4 million for the estate Nazareth Temporary Emergency Housing Project (due to FEMA's refusal to release funds pending audit); that the Authority has delayed work on 42 units at Estate Nazareth; and that another 60 units are not anywhere near completion (despite a waiting list for the units)).

combined with the significance of the new evidence before Judge Brotman further counsel the need for a new and unconstricted look at plaintiffs' claims.

For the foregoing reasons, we will reverse the order of the district court and remand to the district court for reconsideration of plaintiffs' motion for a preliminary injunction with respect to the Tree Boa in light of all relevant evidence available to it. As this matter must come

before the district court for final hearing, we suggest to the district court that it consolidate the preliminary injunction hearing and final hearing pursuant to Fed. R. Civ. P. 65, and in view of the distressed situation of the project, that it list the matter for an early hearing.2

_____

2. The defendants additionally contend that the Hawksbill Sea Turtle, the Green Sea Turtle, and the Tree Boa, all of which are named plaintiffs in the present action, lack standing to sue under the ESA. There are two groups of plaintiffs in the present action: the protected animals and the humans who own real property and reside in the vicinity of the Estate Nazareth housing project. It is not disputed that the human plaintiffs have standing to sue under the ESA, and therefore we need not consider the standing to sue of the animals named as plaintiffs. See Watt v. Energy Action Educational Foundation, 454 U.S. 151 (1981); Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264, & n.9 (1977). (We note in passing, however, that the standing to sue of the animals protected under the ESA is far from clear.

In several cases, standing has been extended without significant analysis to members of protected species that have allegedly been injured. See Palila v. Hawaii Dep't of Land and Natural Resources, 852 F.2d 1106, 1107 (9th Cir. 1988) (the Loxioides bailleui "has legal status and wings its way into federal court as a plaintiff in its own right"); see also Marbled Murrelet v. Babbit, 83 F.3d 1068 (9th Cir. 1996); Mt. Graham Red Squirrel v. Yeutter, 930 F.2d 703 (9th Cir. 1991); Northern Spotted Owl v. Hodel, 716 F. Supp. 479 (W.D. Wash. 1988); Northern Spotted Owl v. Lujan, 758 F. Supp. 621 (W.D. Wash. 1991); Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678 (D.C. Cir. 1982). Additionally, in Marbled Murrelet v. Pacific Lumber Co., 880 F. Supp. 1343 (N.D. Cal. 1995), the district court determined, without resort to the authorizing provision of the ESA, that because of its protected status under the ESA, the Marbled Murrelet "ha[d] standing to sue in its own right." Id. at 1346 (citations omitted); see also Loggerhead Turtle v. County Council of Volusia County, Florida, 896 F. Supp. 1170, 1177 (M.D. Fla. 1995) (same).

I. Facts & Procedural History

The underlying facts are set forth in detail in Virgin Islands Tree Boa, 918 F. Supp. at 884-91, and Hawksbill Sea Turtle, 939 F. Supp. at 1197-99. For present purposes, we make only the following general account.

A. The Estate Nazareth Project

In September 1995, Hurricane Marilyn struck the Virgin Islands, displacing hundreds of people from their homes

and causing extensive property damage. Indeed, five months after the hurricane, many low-income residents of St. Thomas were still living in emergency shelters or in condemned homes. President Clinton declared the Virgin Islands a disaster area, and FEMA made funds available to the Virgin Islands Housing Authority for a housing project, which would consist of prefabricated structures sufficient to house 550 people. VIHA reviewed several sites and selected an area of 8.5 acres at Estate Nazareth, which is adjacent to Vessup Bay. As originally planned, the project would be

_____

On the other hand, in two reported cases in which the naming of an animal as a party was explicitly challenged, the courts, in thoughtful opinions, concluded that a protected animal did not have standing to bring suit. See Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium, 836 F. Supp. 45, 49-50 (D. Ma. 1993) (granting defendants' motion to remove dolphins name from caption of case because they lacked standing to sue under the Marine Mammal Protection Act); Hawaiian Crow v. Lujan, 906 F. Supp. 549, 551-52 (D. Haw. 1991) (holding that Hawaiian Crow was not a "person" with standing to sue under S 11 of ESA). In reaching this conclusion, these courts analyzed the language of section 11 of the ESA. The provision expressly authorizes citizen suits brought by "any person," 16 U.S.C. S 1540(g)(1), and the Act defines the term "person" to mean "an individual, corporation, partnership, trust, association, or any other private entity." 16 U.S.C. S 1532(13). Accordingly, the courts reasoned that Congress's use of the term "person" as defined in S 1523(13) does not include the non-"private," un-"associated" animal. Moreover, Judge Wolf observed that if Congress "intended to take the extraordinary step of authorizing animals ... to sue, they could, and should, have said so plainly." Citizens to End Animal Suffering and Exploitation, 836 F. Supp. at 49.

10

temporary, as the displaced persons would live on the project site only until VIHA repaired their permanent housing. VIHA expected the number of persons residing at Estate Nazareth to decrease rapidly in the first six months.

In preparation for the Estate Nazareth project, FEMA prepared a Final Environmental Assessment Report (the "EA"), in which it analyzed any effects the project might have on the environment, discovering in the process that the project site may be a prime habitat of the endangered Virgin Islands Tree Boa (Epicrates monensis granti). FEMA, in consultation with FWS and the local Division of Fish And Wildlife ("DFW"), developed certain mitigation measures intended to avoid significant harm to the Tree Boa species. The measures included hand clearing of brush prior to the operation of any machinery on site, and collection and

transfer of any snakes found. The procedure of looking for Tree Boas, which are nocturnal animals, would involve examining the rocks and brush where the snakes take refuge during the day. The EA also proposed the restoration of habitat following dismantling of the project.

FEMA also recognized that Vessup Bay was a "sensitive habitat," which would receive the run-off from the housing project. Although the EA failed to mention the Hawksbill and Green Sea Turtles specifically, both are endangered or threatened species that have habitats in the Bay. The EA described measures designed to mitigate the effects of sedimentation and sewage run-off, including sewage control, land clearing guidelines, and prevention of soil erosion. The EA was issued on November 16, 1995. On the same day, FEMA issued a Finding of No Significant Impact, in which it expressed its conclusion that the mitigation measures provided for in the EA would compensate for any significant environmental impacts that might occur.

On December 4, 1995, construction of the Estate Nazareth housing project began. The site was cleared in the manner designated by the Tree Boa mitigation measures provided for in the EA. No Tree Boas were found. Mitigation measures intended to retard soil erosion were also instituted. Following rain showers in mid-January 1996, sediment began to appear in Vessup Bay. In the course of construction, VIHA performed mitigation measures in

11

addition to those recommended by the EA, including laying down gravel and installing silt fences, in order to prevent further runoff into the Bay.

To date, construction of thirty-eight buildings has been completed, thirty-one of which are occupied. Forty two units are nearly ready for occupancy but another sixty are far from completion. Although originally intended to last six months, as FEMA has now described the project, it will last no more than eighteen months from the date of completion or occupation.

B. The First Action

In the first action, eighty-six St. Thomas residents and property owners, together with the Virgin Islands Tree Boa as a named plaintiff, brought suit against FEMA, the FWS, the Governor of the Virgin Islands, the Commissioner of the Virgin Islands Department of Planning and Natural Resources, the Executive Director of VIHA, and VIHA, seeking to enjoin the construction and occupation of the

housing project on the grounds that the defendants had violated various federal and territorial laws. Only the claims based on the ESA and NEPA are relevant here; Judge Finch rejected the others as infirm as a matter of law, and those rulings are not appealed. Plaintiffs asserted that FEMA and FWS had failed to fulfill their duties under the ESA. Virgin Islands Tree Boa, 918 F. Supp. at 892. More specifically, plaintiffs claimed that in the course of defendants' construction of the housing project, defendants had failed to conserve the protected species, as required byS (7)(a)(1),3 or to ensure through consultation with various agencies and the preparation of a "biological assessment" that the project would not jeopardize the continued existence of the

_____

3. Section 7(a)(1) of the ESA provides:

    Federal agencies shall, in consultation with and with the assistance
        of the Secretary, utilize their authorities in furtherance of the
        purpose of this chapter by carrying out programs for the
        conservation of endangered species and threatened species listed
        pursuant to section 1533 of this title.

16 U.S.C. S 1556(a)(1) (1985).

Tree Boa and sea turtles, as required by S 7(a)(2) and S 7(c)(1).4 Additionally, plaintiffs alleged that construction and occupation of the temporary housing project effectuates a "taking" of the Tree Boa and sea turtles in violation of S 9(a) of the ESA.5 Finally, plaintiffs complained that FEMA had prepared an Environmental Assessment ("EA") instead of a more detailed Environmental Impact Statement ("EIS") in violation of NEPA.

Judge Moore granted a temporary restraining order to the plaintiffs and then recused himself. Judge Finch was then assigned the case, and from January 29 through 31, 1995, he held an evidentiary hearing on plaintiffs' motion for a preliminary injunction. Plaintiffs' expert on the Tree Boa and their habitat, Dr. Peter Tolson, testified that the Estate

_____

4. Section 7(a)(2) of the ESA provides:

        Each federal agency shall, in consultation with and with the
        assistance of the Secretary, insure that any action authorized,
        funded, or carried out by such agency ... is not likely to jeopardize
        the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical, unless such agency has been granted an exemption for such action.

16 U.S.C. S 1536(a)(2).

Section 7(c)(1) of the ESA provides:

To facilitate compliance with the requirements of[section 1536(a)(2)]
each Federal agency shall ... request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of ... proposed action. If the Secretary advises,
... such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action ... .

16 U.S.C. S 1536(c)(1).

5. Section 9(a)(1)(B) provides in pertinent part:

[I]t is unlawful for any person subject to the jurisdiction of the United States to take any [endangered or threatened species of fish or wildlife listed pursuant to S 1533 of this title] within the United
States or the territorial sea of the United States.

16 U.S.C. S 1538(a)(1)(B).

Nazareth housing project is a prime habitat for the Tree Boa, and that construction of the project has jeopardized and will continue to jeopardize the existence of the Tree Boa by reducing its habitat and increasing the chances that Tree Boas will be killed by humans and feral animals. He testified that, at the time of the hearing, the latest sighting of a Tree Boa of which he was aware was in the Fall of 1995, before Hurricane Marilyn. Plaintiffs also presented evidence that the increased sedimentation in Vessup Bay would damage the sea grass beds on which the turtles depended for food.

Defendants adduced testimony that efforts to locate Tree Boa conducted during the day on the Estate Nazareth project site had failed to demonstrate the Tree Boa's existence there. Additionally, defendants presented evidence of FEMA's mitigation efforts, as proposed and implemented as of that stage in the project. With regard to the sedimentation build-up in Vessup Bay, defendants

developed evidence that the run-off came from an alternative source, id. at 899, and that mitigation efforts would reduce the possibility that run-off would carry soil into Vessup Bay.

Based on this evidence, Judge Finch entered an order denying the motion for a preliminary injunction. With respect to the Tree Boa, Judge Finch noted that the court could not find that the snakes did in fact live at the project site. Id. at 892. Additionally, he found that, "[w]hile some question remains about the adequacy of the mitigation measures as they existed in early January of this year," the project provided for adequate mitigation of potential adverse effects on the Tree Boa and its habitat, and that "people already living nearby, cars traveling through the area, and animals pose enough threat that the temporary addition of at most 550 people ... poses no significant increase in the dangers already facing the Tree Boa." Id. at 891. Based on these factual findings, the judge concluded that FEMA had complied with NEPA's procedural requirements when it conducted the EA. Id. at 898.

Addressing plaintiffs' ESA claims, Judge Finch held that FEMA had conducted the "Section 7 consultation" with FWS necessary to ensure that it did not take an action that

14

jeopardized the "continued existence of the Tree Boa." Id. at 901-02. Without specifically addressing plaintiffs' S 9 claim, Judge Finch noted that, even if the plaintiffs could succeed on the merits, he would have to dismiss their ESA claims for failure to provide notice to the Secretary of Commerce and the defendants, as the statute and its implementing regulations require.

With respect to plaintiffs' ESA claims regarding the Hawksbill and Green Sea Turtles, Judge Finch noted that, because plaintiffs had failed to allege that any harm had occurred or would occur to either species of turtle or to the grasses upon which the turtles feed, the claims were not properly before the court. Id. at 892, n.23, & 899-900. Judge Finch determined as a matter of fact that, even if they had brought viable claims with respect to the turtles, plaintiffs had failed to "prove sufficiently that the Estate Nazareth Project was the source of any run-off into Vessup Bay." Id. at 900. The plaintiffs appealed to this Court and we affirmed. Virgin Islands Tree Boa v. Witt, 82 F.3d 408 (3d Cir. 1996) (table).

C. The Second Action

Before the case in front of Judge Finch could proceed to a final hearing, the plaintiffs voluntarily dismissed that action under Fed. R. Civ. P. 41(a). Forty-seven of the original property owners then joined with five additional property owners and two new animal species -- the Hawksbill Sea Turtle and the Green Sea Turtle -- as named plaintiffs, and moved for a temporary restraining order in the District Court for the District of Columbia. Pursuing claims under the ESA only, plaintiffs alleged that, in the course of construction of the housing project, defendants had violated S (7)(a)(1) and (2), S 7(c)(1), and S 9. The district court denied plaintiffs' request for temporary injunctive relief and transferred the case to the District Court of the Virgin Islands.

Judge Brotman, to whom the case was reassigned after Judge Finch recused himself, held an evidentiary hearing on August 7 and 8, 1996 on plaintiffs' application for a preliminary injunction. Plaintiffs presented an affidavit from

Dr. Tolson in which he reiterated his belief that the project site was a prime habitat for Tree Boas and that development of the site has had and will continue to have detrimental effects on the Tree Boa population and its habitat. More specifically, he testified that the Tree Boa population would be threatened by an influx of feral predators and human predators, that habitat near the project site cannot support Tree Boas fleeing the cleared project site, and that as more Tree Boas die, there will be a concomitant reduction in the genetic viability of the species, and thus a further risk to its survival.

Dr. Tolson also stated that in the brief period since February 1996 there had been six documented sightings of Tree Boas within one half mile of the project site, in contrast to the thirty-eight sightings reported since the early 1970's. This translates to .85 Tree Boa sightings per month since construction on the Estate Nazareth, as compared to an average of .13 per month in the period before construction. Plaintiffs also presented the affidavit of a lay witness, who testified to observing a live Tree Boa within one half mile of the Estate Nazareth project on two occasions in late spring 1996 (after Judge Finch's evidentiary hearing), and a dead Tree Boa in June.

Judge Brotman denied the requested preliminary injunction. He first determined that Judge Finch's findings of fact relevant to the action before him, which essentially were that "[w]ith the mitigation measures in place," the housing project "does not and will not adversely affect" the

Tree Boa, the Hawksbill Sea Turtle, the Green Sea Turtle, or these animals' habitat," would "be conclusive of the factual issues underlying plaintiffs' present request for injunctive relief." 939 F. Supp. at 1207-08. Judge Brotman concluded, based for the most part on Judge Finch's findings and not on the evidence before him, that plaintiffs had failed to demonstrate that they were likely to succeed on the merits of their S 9 claims or that the protected species were likely to suffer irreparable harm absent injunctive relief. Id. at 1210-11 & n.27. With respect to the turtles, Judge Brotman noted that, even if plaintiffs had demonstrated that injunctive relief was merited, the court would have to dismiss the action for failure to comply with

16

the notice requirements of the ESA. Id. at 1203. Finally, Judge Brotman concluded that defendants had carried out programs for the conservation of the Tree Boa, the Hawksbill Sea Turtle, and the Green Sea Turtle, and had insured that the housing project was not likely to adversely modify these species' habitats, as required for success under S 7(a)(1) and (2). Id. at 1210.

II. Notice to the Secretary of Commerce

As a threshold matter, this appeal requires us to determine whether, because plaintiffs failed to notify the Secretary of Commerce in addition to the Secretary of the Interior of their intent to sue sixty days beforefiling this action, they failed to provide proper notice as required by 16 U.S.C. S 1540(g)(2)(A), and thereby required the district court to dismiss their claims with respect to the turtles. Plaintiffs contend that they satisfied the notice requirements by providing the Secretary of the Interior and the FWS with the requisite sixty days written notice (each of which had ample opportunity to redress the alleged violations of the ESA). We disagree.

Section 11(g) of the ESA authorizes persons to commence civil suits in order to compel compliance with the Act, but "prohibits" any citizen suit "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator." ESA S 11(g)(2)(A)(i), 16 U.S.C. S 1540(g)(2)(A)(i). The ESA defines "Secretary" to mean "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of the Reorganization Plan Numbered 4 of 1970." ESA S 3(15), 16 U.S.C. S 1532(15). The Reorganization Plan, in turn, assigns to the Secretary of Commerce certain enumerated functions formerly under the supervision of the Secretary of the Interior. See Reorg. Plan 4 (1970), 5 U.S.C.

App. 1 (1996).6

_____

6. These functions include:

       (a) All functions vested by law in the Bureau of Commercial
       Fisheries of the Department of the Interior or its head, together
with
       all functions vested by law in the Secretary of the Interior or the
       Department of the Interior which are invested through the Bureau
       or are primarily related to the Bureau, ...

Reorg. Plan No. 4 (1970), 5 U.S.C. App. 1.

The Department of Commerce and the Department of the
Interior share jurisdiction over the implementation of the
ESA. See 50 C.F.R. S 402.02(b) (1995) (addressing
interagency cooperation in implementing the ESA).
Moreover, under 50 C.F.R. S 221, which implements, in
part, the ESA, see 50 C.F.R. S 221.1 (1995); see also 50
C.F.R. 217.1-2 (1995) (noting scope of regulations as
implementing statutes enforced by the Department of
Commerce), the two departments actually share jurisdiction
over the turtles.

50 C.F.R. S 222 explicitly provides that the species of fish
and wildlife at issue here are under the jurisdiction of the
Secretary of Commerce. 50 C.F.R. S 222.23 (listing Atlantic
Hawksbill Sea Turtles and Green Sea Turtles). Similarly,
the Commerce Department's National Marine Fisheries
Service "has sole jurisdiction for sea turtles while the
turtles are in the water." 50 C.F.R. S 222.23(a); see also 50
C.F.R. 1 227.4 (1995) (stating that the Secretary of
Commerce maintains jurisdiction over the Green Sea
Turtle). Once the turtles are on land, however, S 222.23(a)
states that the Department of the Interior's U.S. Fish and
Wildlife Service has jurisdiction. Thus, when the turtles are
swimming in the bay, Commerce bears regulatory
responsibility, and when the turtles return to the beach,
the regulatory baton passes to Interior. The parties agree
that the boundary between land and sea is the mean high
water mark. Only the protected species of fish and wildlife
not listed in S 222.23, including the Tree Boa, are under
the sole jurisdiction of the Secretary of Interior. 50 C.F.R.
S 217.2.

In the present action, plaintiffs allege that the housing
project will harm the marine and land habitat of the turtles,
thereby forcing the turtles to abandon "their traditional
shelter and nesting sites in and around Vessup Bay." The

alleged harm to the turtles cannot be viewed as occurring solely or primarily on land. Plaintiffs allege that the construction of the housing project has and will continue to result in increased sedimentation run-off into Vessup Bay. This sedimentation apparently blocks the sunlight necessary for the growth of the sea grass on which the turtles feed and promotes the growth of algae, which

18

smothers the sea grass beds. This "degrades and ultimately kills those grasses... and will cause the[ ] turtles to either abandon this habitat or starve." Plaintiff's Appellate Brief at 20.

The regulations implementing the ESA instruct that the Secretary of Commerce, in addition to the Secretary of the Interior, has jurisdiction over the turtles named in plaintiffs' present action. Providing notice to the responsible Secretary(ies), which the relevant regulations indicate to be both the Secretary of Commerce and the Interior, is a prerequisite to suit. See Hallstrom v. Tillamook County, 493 U.S. 20, 31 (1989) (holding that compliance with analogous notice provision of the Resource Conservation and Recovery Act ("RCRA"), was a "mandatory condition precedent" to suit); Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072 (9th Cir. 1996) (notice requirement of the ESA is "jurisdictional"); Protect Our Eagles Trees (POETs) v. City of Lawrence, Kansas, 715 F. Supp. 996 (D. Kan. 1989) (dismissing ESA and Clean Water Act ("CWA") claims for failure to comply with jurisdictional sixty-day notice requirements); see also Public Interest Group of N.J. Inc. v. Windall, 51 F.3d 1179, 1189 n.15 (3d Cir. 1995) (noting that an analogous provision in the CWA was a jurisdictional prerequisite to suit).

Accordingly, and unfortunately for the plaintiffs, their failure to notify the Secretary of Commerce of their intention to sue sixty days prior to suit failed to satisfy the Act with respect to the claims regarding the turtles. Thus, although the district court did not formally dismiss the plaintiffs' claims with respect to the turtles, it should have done so. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978) (noting that the limits upon federal jurisdiction must be neither disregarded nor evaded); see also Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d S 3522 at 62 (1987) ("[I]t would not simply be wrong but indeed would be ... unconstitutional" if the federal courts "were to entertain cases not within their jurisdiction.").

Plaintiffs argue incorrectly that, because the Department

of the Interior and not the Commerce Department had been active in the consultation process with FEMA, and because

they had notified the Secretary of the Interior of their intent to file suit, they satisfied the Act's notice requirements for all practical purposes and should be allowed to proceed with a viable claim in the district court. The Supreme Court, faced with an analogous notice provision under the RCRA, made clear that, where plaintiffs' fail to fully comply with the notice requirement, the court must dismiss the underlying suit. Hallstrom, 492 U.S. at 23.

In Hallstrom, petitioners had given notice of their intention to file suit to the alleged violator but had not notified the EPA. The Supreme Court held that, even though the EPA had expressed no interest in taking action against the alleged violator, so that notice to the agency could be of no practical effect, the unambiguous language of the notice provision prohibited the district court from giving that language "a flexible or pragmatic construction." Id. at 24-27. The Court held that the notice requirements can not "be disregarded by the district court at its discretion" and, instead, complete satisfaction of requirements "is a mandatory, not optional, condition precedent for suit." Id. at 26; see also Save the Yaak Comm. v. Block, 840 F.2d 714, 721 (9th Cir. 1988) (letters sent to various state and federal legislators did not satisfy the notice requirement because notice had not been sent to requisite parties).

Plaintiffs contend that this Court's decision in Public Interest Research Group v. Hercules, Inc., 50 F.3d 1239 (3d Cir. 1995), establishes that a hyper-technical reading of the ESA's notice requirements is not required by Hallstrom and in fact is inappropriate where, as allegedly is the case here, the underlying purposes of the Act counsels against dismissal of the action. In Hercules, petitioners notified the requisite federal and state agencies and the alleged violator of their intent to assert sixty-eight violations of the CWA. The petitioners waited the requisite sixty days andfiled a complaint, which included more than thirty alleged violations of the CWA that were not contained in the original notice. The district court dismissed, but we reversed, holding that the notice letters did not fall short of the statutory requirements despite the fact that the defendants were not notified of all of the petitioners' allegations.

In doing so, we compared the flaws of the notification letter with the congressional purposes of the notice provision, which are: (1) giving the alleged violator an opportunity to remedy the alleged violations; and (2) giving the federal agencies with statutory enforcement powers an opportunity to commence their own enforcement action. Id. at 1246 (citing S. Rep. No. 92-414 at 80 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3745). We found that when a petitioner notifies the requisite parties and provides sufficient information to permit the recipient to address the alleged violations, notice is sufficient. Id. at 1246-49; see also Marbled Murrelet, 83 F.3d at 1073 (letter to federal defendants gave adequate notice, even though it contemplated suit under S 9 rather than S 7).

Plaintiffs contend that, under Hercules, because FEMA's ability to address its alleged violations of the ESA in no way turned on whether the Department of Interior or the Commerce Department received notice of their intent to bring suit, and thus notifying the Commerce Department would not have fostered further compliance with the ESA, their failure to provide notice to the Secretary of Commerce should not prove fatal to their action. However Hercules is inapposite. In Hercules, each of the requisite defendants had received notice of petitioner's intent to file suit, and therefore our focus was on the contents of the notification given and not, as was the case in Hallstrom, on whether notice was in fact given.

Moreover, in Hercules, we distinguished Hallstrom on the ground that while "the literal reading of the statute compelled the [Hallstrom] Court's interpretation of the 60-day delay requirement, there is no express requirement in the statute pertaining to the content of a notice letter." Hercules, 50 F.3d at 1249 (emphasis added). As a result, in Hercules, when the requisite parties were in fact on notice of the alleged violations, we were free to interpret the statute flexibly so as to promote the purposes of the Act.

In the case at bar, however, no such room for discretion exists. Unlike Hercules, the agency charged here with enforcement of the ESA, the Commerce Department, never received notice. And, as previously noted, the ESA's notice provision explicitly bars citizen suits unless the plaintiff

provides notice to the Secretary(ies) responsible for the species at issue, in this case the Secretary of Commerce and the Secretary of the Interior, sixty days prior to suit.

A literal interpretation of the Act's notice provision in this case actually furthers the purposes of that provision by giving the Commerce Department the opportunity to commence its own enforcement action. It is only when a regulatory agency fails to exercise its regulatory responsibilities that enforcement through citizen suits becomes important. See S.Rep. No. 92-414, at 64, 2 Leg. Hist. at 1482, reprinted in 1972 U.S.C.C.A.N. 3730 ("It should be noted that if the Federal, State, and local agencies fail to exercise their enforcement responsibility, the public is provided the right to seek vigorous enforcement action under the citizen suit provisions."). While it is unclear how the Secretary of Commerce would have proceeded had he been given notice of plaintiffs' intent to sue, it is not for us to deny the Department the opportunity to address the plaintiffs' allegations prior to the commencement of litigation.

Finally, plaintiffs urge us not to require dismissal of this action with respect to the turtles because the notice provision of the ESA is fatuous, in that it requires notification of a different agency depending upon where the turtles are located at a given moment, and also unnecessarily contorted, in that it requires a plaintiff to rummage through the complicated implementing regulations in order to determine who must be notified. While that argument has much appeal, as Judge Roth has so carefully illuminated, we are not at liberty to excuse plaintiffs' failure on the ground that a technical reading of the Act's notice provision would be "inappropriate."7

_____

7. We do however think that Congress and the agencies involved should put their heads together and fashion a simple and clearer notice scheme. To that end, we direct the Clerk of Court to send a copy of this opinion with particular attention to this footnote and Judge Roth's dissent to counsel for the majority leader and ranking member of the minority of the House and Senate Commerce and Interior Committees, and to the general counsel of the Department of Commerce and the Department of Interior.

22

As previously discussed, S 11 explicitly prohibits persons from bringing suit absent satisfaction of the sixty-day notice provision and admits of no exception. Because that provision and its implementing regulations admit of no ambiguity, the language of the Act must be regarded as conclusive. See Garcia v. United States, 469 U.S. 70, 75 (1984) ("[O]nly the most extraordinary showing of contrary intentions from the [legislative history] would justify a

limitation on the `plain meaning' of the statutory language."). Moreover, plaintiffs were represented by counsel, who had reason to know that the Secretary of Commerce, in addition to the Secretary of the Interior, required notification of plaintiffs' intent to sue. Indeed, in a supplemental memo to Judge Finch, defendants stated that the Commerce Department had jurisdiction over the sea turtles in their marine environment.8 Plaintiffs and their counsel also must have known that a failure to comply fully with the notice provision would result in dismissal, given that, in the previous action, Judge Finch specifically noted that plaintiffs' failure to notify the federal defendants would require the court "to dismiss plaintiffs' [ESA] claims." Virgin Islands Tree Boa, 918 F. Supp. at 902.

Despite its conclusion that plaintiffs had failed to satisfy the notice requirements of the ESA, the district court did not dismiss the plaintiffs' claims with respect to the turtles, though it should have done so. Thus, we will remand to the district court with instructions to dismiss those claims. In doing so, we note that plaintiffs have since given notice to the Secretary of Commerce, and they are now at liberty to refile their claims and request that the matter be consolidated with the Tree Boa proceedings presently before the district court.9

_____

8. This is thus not a case where laymen are left to unravel a complex statutory scheme without the assistance of counsel. Compare Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 397 (1982) (where "technical reading would be particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process," timely notice under Title VII is not a jurisdictional prerequisite (citations
omitted)).

9. At oral argument, government counsel conceded that, should we dismiss plaintiffs' ESA claims with respect to the turtles, plaintiffs would

III. Denial of Preliminary Injunction

Judge Brotman denied plaintiffs' request for injunctive relief under S 7(a)(1) and (2), S 7(c), and S 9 on the grounds that plaintiffs had not provided evidence sufficient to demonstrate a likelihood of success on the merits of their claims or to establish that, absent injunctive relief, the protected species would suffer irreparable injury. Hawksbill Sea Turtle, 939 F. Supp. at 1210. Plaintiffs challenge Judge Brotmans's holding with respect to their S 9 claim on the

ground that it erred in giving the findings of Judge Finch preclusive effect.10 More specifically, plaintiffs contend that the application of collateral estoppel was inappropriate because: (1) any findings made with respect to plaintiffs' ESA claim were part of an alternative holding, and therefore not necessary to the prior ruling; and (2) the issues involved in the first proceeding were not identical to those presented here.11

_____

not be barred by a statute of limitations challenge from filing a new action. As a result of this statement, we need not examine whether plaintiffs would otherwise be subject to a statute of limitations under the
ESA or applicable state law.

10. Plaintiffs assert that Judge Brotman erred in holding that Judge Finch's finding that defendants complied with the procedural requirements of NEPA precluded them from asserting a claim for lack of compliance with S 7(c) of the ESA. Given thatS 7(c)(1) appears to anticipate that compliance with NEPA procedural measures can fulfill obligations under the ESA, see 16 U.S.C.S 1536(c)(1) (if Secretary requires biological assessment, "[s]uch assessment may be undertaken as part of Federal agency's compliance with the requirements of ... NEPA."), we find no merit in plaintiffs' challenge.

11. Plaintiffs additionally contend that, as a matter of law, findings made
in the course of a preliminary injunction cannot support the application of issue preclusion. In making this contention, plaintiffs rely on several cases holding that orders granting preliminary injunctions are generally not accorded preclusive effect in litigation on the merits in the same or different proceeding. See University of Texas v. Camenisch, 451 U.S. 390, 396-98 (1981) (no preclusive effect in litigation on merits of same case); Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1350 (9th Cir. 1982) (refusing to apply collateral estoppel to state court finding made in preliminary injunction proceeding in trial on merits of plaintiff 's S 1983
claim); Community Nutrition Inst. v. Block, 749 F.2d 50, 56 (D.C. Cir. 1984) (refusing to accord preclusive effect to determination made in

As an initial matter, it is not entirely clear whether the denial of injunctive relief rested on the preclusive effect given to Judge Finch's findings. In concluding that plaintiffs had failed to provide sufficient evidence to demonstrate irreparable harm, Judge Brotman stated that he based his factual findings on the "review of Judge Finch's findings, the parties' submissions, and the testimony taken at the evidentiary hearing in the present matter." Hawksbill Sea Turtle, 939 F. Supp. at 1210-11.

This statement suggests that he might have reached his conclusion based on an independent review of the new evidence (some of which was quite compelling for the plaintiffs). However, Judge Brotman explicitly adopted as "conclusive" those of "Judge Finch's findings of fact with respect to plaintiffs' claims in the previous action [that]

_____

granting of preliminary injunction in final hearing on the merits in a different case); Zenith Radio Corp. v. Matsushita Elec. Ind. Co., 505 F. Supp. 1125, 1185 (E.D. Pa. 1980) (Judge's findings, "which are addressed to the preliminary motion to dismiss, are not `the law of the case[,]' . . . do not control the issues . . . upcoming in connection with the motions for summary judgment."). But findings made in granting or denying preliminary injunctions can have preclusive effect if the circumstances make it likely that the findings are"sufficiently firm" to persuade the court that there is no compelling reason for permitting them to be litigated again. Dyndul v. Dyndul, 620 F.2d 409, 411-12 (3d Cir. 1980); accord Commodity Futures Trading Comm'n v. Bd. of Trade, 701 F.2d 653, 657 (7th Cir. 1983) (findings made in preliminary injunction decisions have preclusive effect "if the circumstances make it likely that the findings are accurate [and] reliable"); Wright & Miller, supra, S 4434, S 4445; 1 Restatement of Judgments (Second) S 13, supra, illus. 1 at 136-37 (1982). (Whether the resolution in the first proceeding is sufficiently firm to merit preclusive effect turns on a variety of factors,
including "whether the parties were fully heard, whether the court filed a reasoned opinion, and whether that decision could have been, or actually was appealed." In re Brown, 951 F.2d 564, 569 (3d Cir. 1991). Preclusion would seem to be particularly appropriate in a second action seeking the same injunctive relief. See Lyon Ford, Inc. v. Ford Marketing Corp., 337 F. Supp. 691, 695 (D.C.N.Y. 1971); Wright & Miller, supra, S 4445. However, because we determine herein that the issues involved in the first proceeding simply were not identical to those presented here, we do not decide whether Judge Finch's findings were "sufficiently firm" to merit the application of collateral estoppel.

25

apply to plaintiffs' claims in the present action." Id. at 1207-08. As a result, we cannot be sure that such an unencumbered review took place, and we review the district court's denial of injunctive relief through the lens of the collateral estoppel doctrine.

A. The Test for Collateral Estoppel

The doctrine of collateral estoppel prevents the relitigation of issues that have been decided in a previous action. See Montana v. United States, 440 U.S. 147 (1979). Also referred to as issue preclusion, the doctrine "protect[s] litigants from the burden of relitigating an identical issue

with the same party or his privy and ... promot[es] judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Traditionally, four factors must be present before the application of collateral estoppel is appropriate: (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action. Raytech Corp. v. White, 54 F.3d 187, 190 (3d Cir. 1995). In the case at bar, our attention is focused on the first and second factors; however, when any one of these factors goes unsatisfied, then the application of collateral estoppel is inappropriate, for it would unjustly foreclose matters that have yet to be litigated.

Central to our understanding of why, as we conclude herein, Judge Finch's findings fail to satisfy the requisites for the application of collateral estoppel is an iteration of what claims were before the court in the first action and how Judge Finch disposed of them.

B. The Holdings of Judge Finch

The factual findings from the first action given preclusive effect were made in the course of Judge Finch's determination of plaintiffs' claims pursuant to NEPA and the ESA. With respect to NEPA, Judge Finch rejected plaintiffs' claim that FEMA had violated S 102(2)(C) of NEPA

26

by preparing an Environmental Assessment ("EA") rather than a more extensive Environmental Impact Statement ("EIS"), which is normally required for "major Federal actions significantly affecting the quality of the human environment." Tree Boa, 918 F. Supp. at 891-92. Judge Finch concluded that the plaintiffs' had failed to demonstrate a likelihood of success on the merits of this claim, because, as FEMA had adequately considered the environmental impact of the housing project and provided for mitigation measures to reduce "to an insignificant level" any adverse effects on the Tree Boa, its Environmental Assessment satisfied NEPA's requirements.

In disposing of plaintiffs' ESA claims in turn, Judge Finch concluded that FEMA and FWS had conducted an adequate S 7 consultation, as required by 16 U.S.C. S 1536(a)(2), thereby "fulfilling their duties to safeguard the future of the Tree Boa." Tree Boa, 918 F. Supp. at 902. Alternatively, Judge Finch found that he was compelled to

dismiss plaintiffs' ESA claims with respect to the Tree Boa for failure to provide proper notice to the Secretary and the alleged violator as required by 16 U.S.C. S 1540(g)(1)(A). Judge Finch did not address the merits of plaintiffs' claims brought pursuant to S 9.12

C. Alternative Holdings

Because Judge Finch determined that he did not have the power to hear plaintiffs' ESA claims, any findings made with respect to the merit of those claims are not essential to the judgement and cannot support the application of collateral estoppel. See Stebbins v. Keystone Ins. Co., 481 F.2d 501, 508 (D.C. Cir. 1973) (holding that collateral estoppel is not applicable to finding against plaintiff on merits where court also held that plaintiff lacked standing); Bokunewicz v. Purolator Products, Inc., 907 F.2d 1396, 1399 (3d Cir. 1990) (holding that "everything after denial of jurisdiction" is "dicta, pure and simple"); Restatement of

_____

12. Because we conclude, supra, that, in their second action, plaintiffs' failed to satisfy the notice requirements of the ESA with respect to the Hawksbill and Green Sea turtles, we do not address Judge Finch's factual findings or legal conclusions pertaining to those species.

27

Judgments, supra, S 20, cmt. b, illus. 1 (dismissal of claim for lack of subject matter jurisdiction does not bar relitigation after the jurisdictional defect has been cured) and cmt. e; Wright & Miller, supra, S 4421, at 207-08 ("If a first decision is supported by findings that deny the power of the court to decide the case on the merits and by findings that reach the merits, preclusion is inappropriate as to the findings on the merits."). As a result, we must examine Judge Finch's findings in the context of plaintiffs' NEPA claim.

D. The NEPA Claim

In the first action, plaintiffs asserted that FEMA had violated NEPA by failing to engage in the requisite before-the-fact risk analysis concerning the project site. In disposing of plaintiffs' NEPA claim, Judge Finch drew upon factual findings he had made at the outset of his opinion. Judge Finch first concluded that FEMA did not err in preparing an EA rather than an EIS given the evidence that the projects would have "insignificant effects" on the Tree Boa and Vessup Bay.

Judge Finch then explained why he considered valid

FEMA's conclusion that the Tree Boa would not be significantly affected by the Project:

> [T]he existence of any Tree Boas on the site is uncertain. This Court finds that based on the evidence presented to the Court, the last time one of the World's leading experts on the Tree Boa found one near the site of the Estate Nazareth Project was in 1987, despite having looked for them in 1991. He had not found any following Hurricane Marilyn. The Tree Boas are nocturnal and often the only visible signs of them during daylight are their refugia. Teams of people looked for those signs during the early stages of the construction process at the Estate Nazareth site. No one found any Tree Boas on the site. Likewise, their refugia were not found. Further, habitat remains in the nearby area to provide a place for the Tree Boa to live. A minimal increase in any threat to the Tree Boa will be created by the temporary small increase in the area's human population due to the Project.

28

Id. at 899. Judge Finch also noted that an EIS need not be done "[i]f a mitigation condition eliminates all significant environmental effects." Id. at 898. While he cautioned that "some question remains about the adequacy of the mitigation measures as they existed in early January of this year," id. at 890, Judge Finch ultimately concluded that if the mitigation measures established by FEMA in the EA were followed, the future of the Tree Boa would be adequately safeguarded. Id. at 898.

Thus, Judge Finch's ultimate conclusion that FEMA had satisfied its procedural duties under NEPA was based on the interrelationship between three factual findings: (1) no Tree Boas were present on the project site; (2) FEMA had adequately planned for the institution of mitigation measures designed to protect the species and its habitat; and (3) the influx of humans and their concomitant dangers would be small in number and temporary. In the second action, the district court explicitly referenced only the second of these findings -- that mitigation measures adequately safeguarded the Tree Boa, and, in fact, explicitly noted that the existence of Tree Boa was no longer in dispute. However, because the finding as to the adequacy of the mitigation measures relies in part upon Judge Finch's initial conclusion that no Tree Boas were present and that any risk to the species would be temporary, we examine the new evidence presented in plaintiffs' second action with respect to all three factual findings. Given the new evidence and the nature of plaintiffs' ESA claims, to which we shall

now turn, none of these findings merit collateral estoppel effect so as to preclude plaintiffs' from litigating their claims before the district court.

E. The New Evidence

Judge Finch's finding that no Tree Boas were present on the project site was directly contradicted by evidence adduced by plaintiffs in their second action. In thefirst proceeding, Dr. Tolson, who is widely acknowledged as the leading expert on the Virgin Islands Tree Boa, testified that he last saw a Tree Boa in the vicinity of the project site in the Fall of 1987. In the second proceeding, plaintiffs produced an affidavit by Dr. Tolson, in which he declared

that, since the beginning of construction on the Estate Nazareth site, there had been six documented sightings of Tree Boas, two of which involved dead or dying animals, all sighted within one-quarter to one-half mile from the project site. This represents a marked increase in the frequency of Tree Boa sightings, of which there were only 38 total incidents since the early seventies. Moreover, the number of sightings is additionally significant given that the Tree Boa population numbers less than 500 animals.

Additionally, in making his findings, Judge Finch credited the temporary nature of the housing project, concluding that the dangers posed by a short term influx of human beings was slight. See supra, at 38-39. Furthermore, he reviewed mitigation measures proposed by FEMA that were designed for a project of six months in duration, and represented that "it would not be extended in any circumstances for a total duration exceeding eighteen months." Yet by September 1996, the time of the evidentiary hearing before Judge Brotman, it was clear that the project could no longer be considered "temporary" in the sense intended by Judge Finch. The project had been under construction for eight months, and defendants represented that the project was now expected to last up to eighteen months past the completion of construction. As we have seen, the project is now in limbo and may last much longer.

Collateral estoppel applies only when the same issues decided in the past action arise again in the present context, see Southern Pacific R.R. v. U.S., 168 U.S. 1, 48 (1897), so that when significant new facts grow out of a continuing course of conduct the issues in a successive suit may fail to constitute the same "issue" so as to merit preclusive effect. See Brogsdale v. Barry, 926 F.2d 1184,

1188 (D.C. Cir. 1991) (finding that a 1975 determination that unconstitutional crowding existed at a jail could not be dispositive of the conditions existing in 1983); Fleer Corp. v. Topps Chewing Gum, Inc., 501 F. Supp. 485, 513 (D.C. Pa. 1980) (holding that changes in the baseball card market between 1965 and 1980 foreclosed any argument that a definition of the relevant market by the Federal Trade Commission could preclude relitigation of the market

definition issue); Wright & Miller, supra,S 1417, at 162-63; Restatement of Judgments, supra, S 13 cmt. c. Based upon this body of law, we do not believe that Judge Finch's factual findings precluded consideration of additional evidence in support of plaintiffs' ESA S 9 claims. Thus, we conclude that Judge Brotman erred in giving Judge Finch's findings preclusive effect and failing to examine all of the evidence before him in considering plaintiffs' request for injunctive relief.

F. The ESA Claims and New Evidence

The inappropriateness of applying issue preclusion to plaintiffs' ESA S 9 claim is compounded by the fact that S 9 requires a different analysis of the facts than did the NEPA claims of plaintiffs' first action. Congress, through the enactment of NEPA, required FEMA "to take a hard look at environmental consequences before taking a major action." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983). NEPA's "dominant `thrust' ... is to ensure `that environmental concerns [are] integrated into the very process of agency decisionmaking.' " Township of Lower Alloways Creek v. Public Serv. Elec. & Gas Co., 687 F.2d 732, 739 (3d Cir. 1982) (quoting Andrus v. Sierra Club, 442 U.S. 347, 350 (1979)). The procedural requirements of NEPA are satisfied if FEMA has proved that it has adequately considered the interests of the Tree Boa in planning for the Estate Nazareth project. See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558 (1978). Thus, NEPA provides for a before-the-fact risk analysis procedure, and accordingly Judge Finch had to review only anticipatory mitigation measures, not the mitigation measures as implemented.

Plaintiffs' second action, in contrast, is founded largely on allegations that the construction and operation of the housing project constituted a "taking" in violation of S 9 of the ESA. To "take" is defined in the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16

U.S.C. S 1532(19). The relevant implementing regulations provide that "harm" is defined to include an act "which

actually injures or kills wildlife" or "which annoy [a species] to such an extent as to significantly disrupt essential behavioral patterns." See 50 C.F.R. S 17.3 (superseded). According to plaintiffs, these "takings" result from agency actions that have killed or injured the Tree Boa, or present an imminent threat of doing so, and that have "adversely affected its environment to the extent of impairing its natural behavior patterns." Hawksbill, 939 F. Supp. at 1200.

Plaintiffs' S 9 claims in the second action focus on a different aspect of FEMA's conduct from their first action. Instead of challenging FEMA's planning, they call into question the defendants' execution of their agency action. That is, even if agency action satisfies the procedural requirements of NEPA, it could still constitute a "taking" in violation of S 9.

However, instead of examining the evidence regarding defendants' execution of their duties based on the record as developed before it, Judge Brotman explicitly gave collateral estoppel effect to Judge Finch's finding that "the mitigation measures established for the projected construction of the temporary housing project were adequate." Hawksbill Sea Turtle, 939 F. Supp. at 1210. Where S 9 required an analysis of whether, given the mitigation measures actually implemented, a Tree Boa had been "taken", Judge Finch's finding focused exclusively on the proposed mitigation measures. Judge Finch, in fact, cautioned that "some question remains about the adequacy of the mitigation measures as they existed in early January of this year." Tree Boa, 918 F. Supp. at 890.

In sum, we conclude that Judge Finch did not decide the identical issue (as to the adequacy of the mitigation measures) placed before Judge Brotman by plaintiffs'S 9 claim. We will therefore reverse the order of the district court and remand this case to the district court for reconsideration of plaintiffs' motion for preliminary injunction under S 9 of the ESA brought on behalf of the Tree Boa. The district court shall enter an order dismissing

the plaintiffs' claims with respect to the Hawksbill and

_____

13. In their second action, plaintiffs asserted that the court should have abandoned the normal practice of balancing the equities when considering an application for injunctive relief brought under the ESA, and focused instead on whether plaintiffs' could demonstrate a likelihood of success on the merits. They argued that in TVA v. Hill, 437 U.S. 153 (1978), the Supreme Court pronounced that because S 7 contains a flat ban on the destruction of critical habitats, it revokes a court's usual, equitable discretion to grant equitable relief in an action involving the ESA. Hawksbill Sea Turtle, 939 F. Supp. at 1208. This argument may have merit and we identify the pros and cons of the issue because the district court will have to deal with it on remand.

In a typical preliminary injunction proceeding, a district court would consider four factors: (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. Merchant & Evans, Inc. v. Roosevelt Building Products, Inc., 963 F.2d 628, 632-33 (3d Cir. 1992). Only if the plaintiff produces evidence sufficient to show that all four factors favor preliminary relief would the court issue a preliminary injunction. Id. The district court applied this test in denying plaintiffs motion for injunctive relief, but it is by no means clear that this is the test for an injunction under the ESA.

In TVA v. Hill, 437 U.S. 153 (1978), the Supreme Court held that Congress had explicitly foreclosed the exercise of traditional equitable discretion by courts faced with a violation of S 7 of the ESA. At the time of that decision, S 7 commanded all federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species. 16 U.S.C. S 1536 (1976). In Hill, the Court affirmed the issuance of an injunction which closed the nearly completed Tellico Dam (despite the potential loss of millions of dollars), because of alleged harm to the endangered snail darter. In doing so, the Court noted that the "language, history, and structure" of the Act "indicates beyond doubt" that Congress conclusively determined that the public interest always weighed in favor of preservation of endangered species. Id. at 174.

We note, however, that Congress has revisited S 7 three times since the Court rendered its opinion in TVA v. Hill. See Pub. L. No. 95-632, S 3, 92 Stat. 3751, 3752-60 (1978); Pub. L. No. 96-159,S 4, 93 Stat. 1225,

footnote continues . . .

1226-28 (1979); Pub. L. No. 97-304, S 4, 96 Stat. 1411, 1417-20 (1982).

As a result of these amendments, the obligation of the federal agencies is now to "insure that any action ... is not likely to jeopardize the continued existence of any endangered species."S 7(a)(2), 93 Stat. at 1226, codified at 16 U.S.C. S 1536(a)(2) (1982) (emphasis added). The amendments also formalized the consultation process and created a procedure whereby agencies could seek exemptions for projects unable to conform with the requirements of S 7(a)(2) that nevertheless met other stringent criteria. Although the amendments weakened the standard insofar as the section's protection of listed species is now less absolute, we are not convinced that they diminish the precedential force of the Supreme Court's opinion in TVA v. Hill. Nothing in the amendments or their history suggests that Congress intended to overrule TVA v. Hill, or to deflate its prioritization of endangered species by returning equitable discretion to the courts. See Sierra Club v. Marsh, 816 F.2d 1376, 1383 n.10 (9th Cir. 1987) (amendments do not alter precedent of TVA v. Hill).

Moreover, the Supreme Court appears to have subsequently expressed the view that S 7 still limits a court's equitable discretion. In Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), the Court held that the Federal Water Pollution Control Act ("FWPCA") did not foreclose the exercise of equitable discretion, and contrasted that statute with the ESA:

> In TVA v. Hill, we held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity.... It was conceded in Hill that completion of the dam would eliminate an endangered species by destroying its critical habitat. Refusal to enjoin the action would have ignored the "explicit provisions of the Endangered Species Act." 437 U.S. at 173. ... The purpose and language of the statute limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act.

456 U.S. at 313-14; see also Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 543 n.9 (1987) (same).

Although TVA v. Hill addressed S 7 of the ESA, this standard for injunctive relief might appropriately extend to a claim asserted under S 9, which prohibits the "taking" of an endangered species, for the language and legislative history of that provision is equally unambiguous in its prioritization of the protection of endangered species. The fact that the protections of S 9 are arguably more extensive than those embodied in S 7 lends support to plaintiffs' argument. Section 7, entitled "Interagency Cooperation," requires all federal agencies to consult with the appropriate wildlife agency to insure that any proposed action is not likely to jeopardize the continued existence of an endangered species or destroy its critical habitat. It calls for a risk analysis before the fact. In

footnote continues . . .

contrast, S 9 flatly bans certain actions and has a broad scope, extending beyond the actions of federal agencies to include both private and state actions. See Paul D. Ort, What Does It Take To Take and What Does It Take to Jeopardize? A Comparative Analysis of the Standards Embodied in Sections 7 and 9 of the Endangered Species Act, 7 Tul. Envtl. L.J. 197 (1993).

At this juncture, it would seem improper to require a plaintiff to meet a different injunctive standard with respect to the substantive S 9 claim than a S 7 claim, when the provisions are intended to work in tandem towards the same objective, namely, protection of endangered species. Other courts have concluded the same, holding that, when faced with a request for injunctive relief under the ESA, a plaintiff need only show that a defendant has violated the act to be entitled to injunctive relief. See Sierra Club, 816 F.2d at 1384 (Sierra Club is "entitled to relief if the [defendants] violated a substantive or procedural provision of the ESA."); Loggerhead Turtle, 896 F. Supp. at 1178 (holding that, if defendants violated substantive or procedural provision of ESA, a court does not have traditional equitable discretion, instead "any threatened harm is per se irreparable harm and ... public interest always favors the imposition of an injunction").

Thus, plaintiffs' challenge raises a serious question, and there is certainly a strong argument to be made that the court's discretion is in fact limited. But the parties did not brief the isssue here, and, given the new developments in the case, we think they deserve an opportunity to address it anew in the district court.

Judge Weis does not join in this footnote, but agrees with Judge Brotman's statement that here "the loss involves the equally incalculable value of the sanctity and quality of human life." Consequently, "this court will not abandon the traditional equitable principles in evaluating plaintiffs' application for a preliminary injunction; . . . . Hawksbill Sea Turtle, 939 F.Supp. 1208.

ROTH, Circuit Judge, Concurring and Dissenting :

Although the majority engages in a thoughtful discussion of the issues presented in this appeal, I cannot join the conclusion that the plaintiffs' Endangered Species Act (ESA) claims brought on behalf of the Hawksbill and Green Sea

Turtles do not satisfy the notice requirements of S 11(g) of the ESA, 16 U.S.C. S 1540(g). Accordingly, I would not dismiss the claims brought on behalf of the Sea Turtles. In addition, because I would not dismiss these claims, I have gone on to consider the district's court order refusing plaintiffs' application for a temporary restraining order and preliminary injunction on behalf of the Hawksbill and Green Sea Turtles. I would reverse that order and remand for further proceedings.

I. Notice To "The Secretary"

Although the majority acknowledges the complexity of the task it places upon prospective litigants, the labyrinthine nature of the ESA's statutory and regulatory scheme becomes apparent only upon a closer examination than the one given to it by my colleagues. Section 11(g)(2)(A) of the ESA provides that no citizen suit may be commenced "prior to sixty days after written notice of the violation has been given . . . ." 16 U.S.C. S 11(g)(2)(A). The Act nowhere specifies the content of this notice but requires that the notice be directed to "the Secretary, and to any alleged violator . . ." Id. Section 1532(15) defines the term "Secretary" to mean "the Secretary of the Interior or the Secretary of Commerce as program provisions are vested pursuant to the provisions of Reorganization Plan Number 4 of 1970." 16 U.S.C. S 1532(15).

A daunting amount of investigation is required before a potential litigant can determine which "Secretary" to serve notice upon. The text of S 1540(g)(2) offers no basis for deciding when notice is to be referred to the Secretary of the Interior and when notice is to be served upon the Secretary of Commerce. Although the ESA refers to Reorganization Plan Number 4 of 1970, that document merely informs the reader that certain functions, formerly committed to other federal agencies, have been transferred to the Secretary of Commerce, including:

36

   (a) All functions vested by law in the Bureau of Commercial Fisheries of the Department of the Interior or its head, together with all functions vested by law in the Secretary of the Interior or the Department of the Interior which are invested through that Bureau or are primarily related to the Bureau, . . . .

   (b) The functions vested in the Secretary of the Interior by the Act of September 22, 1959 (Public Law 86-359, 73 Stat. 642, 16 U.S.C. 760e-760g; relating to migratory marine species of game fish).

5 U.S.C. App. 1 Reorg. Plan 4 (1970).

Potential litigants, who have not given up at this point, can begin combing through Title 50 of the Code of Federal Regulations for a clue as to which Secretary should be served with notice. The first helpful section encountered is 50 C.F.R. S 17.2, which purports to define the scope of the USFWS's regulations on endangered and threatened wildlife and plants:

> By agreement between the [United States Fish and Wildlife] Service and the National Marine Fisheries Service, the jurisdiction of the Department of Commerce has been specifically defined to include certain species, while jurisdiction is shared with regard to certain other species. Such species are footnoted in Subpart B of this part, and reference is given to special rules of the National Marine Fisheries Service for those species.

50 C.F.R. S 17.2(b).

A fair reading of this section is that jurisdiction is shared between the USFWS (a Department of the Interior agency) and the NMFS (a Department of Commerce agency), and that the allocation of species to each service will be identified in Subpart B. Such a reading would, however, prove to be incorrect. Although Subpart B contains an exhaustive list of endangered and threatened flora and fauna, it gives no indication which agency possesses jurisdiction for the administration of the ESA as to these species, and it speaks not a word about pre-suit notice. See 50 C.F.R. SS 17.11 & 17.12.

37

Not until Title 50, Chapter II, Subchapter C1 can the reader begin to put it all together. In 50 C.F.R.S 217.2 the reader is informed that the regulations contained in 50 C.F.R., parts 216 through 227,

> apply only for fish or wildlife under the jurisdictional responsibilities of the Secretary of Commerce for the purpose of carrying out the Endangered Species Act of 1973 (see Part 222, S 222.23(a)). Endangered species of fish or wildlife other than those covered by these regulations are under the jurisdiction of the Secretary of the Interior. For rules and procedures relating to such species, see 50 C.F.R. Parts 10-17.

50 C.F.R. S 217.2. Section 222.23(a) finally designates some

species as coming under the jurisdiction of the Secretary of Commerce: "Atlantic Hawksbill sea turtles (Eretmochelys imbricata)" and "Green sea turtles (Chelonia mydas) breeding colony populations in Florida and on the Pacific Coast of Mexico."2 Section 222.23(a) also states that there exists a division of agency jurisdiction for sea turtles: "The National Marine Fisheries Service has sole agency jurisdiction for sea turtles while the turtles are in the water and the U.S. Fish and Wildlife Service has jurisdiction for sea turtles while the turtles are on land." Id.

In Chapter IV of Title 50, there finally appear certain joint regulations involving the United States Fish and Wildlife Service, the National Marine Fisheries Service, and the National Oceanic and Atmospheric Administration. With respect to the scope of the regulations on joint administration of the ESA, S 402.01(b) explains:

> The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) share responsibilities for administering the Act. . . .

_____

1. Subchapter C is inappropriately titled "Marine Mammals," given that it informs the reader of the notice requirement as it applies to sea turtles, which are not mammals.

2. Far from dealing with pre-suit notice, S 222.23 identifies the species for which the NMFS can issue permits to authorize incidental takings for scientific purposes or for the enhancement of propagation or survival of the affected endangered species. See generally  50 C.F.R. S 222.23.

> Endangered or threatened species under the jurisdiction of the NMFS are located in 50 C.F.R. S 222.23(a) and 227.4. If the subject species is cited in 50 C.F.R. 222.23(a) or 227.4, the federal agency shall contact the NMFS. For all other listed species the federal agency shall contact the FWS.

50 C.F.R. S 402.01(b). Section 227.4, referred to above, merely identifies Green Sea Turtles as a threatened species. A footnote appended to that section observes that NMFS jurisdiction for sea turtles is limited to when the turtles are in the water. See 50 C.F.R. S 227.4 n.1.

The byzantine nature of these regulations demonstrate the magnitude of the burden the majority's decision places on a party wishing to sue under the ESA. None of these regulations even remotely address the question of notice of intent to sue. Indeed, 50 C.F.R. S 402.01(a) states that the

purpose the regulations promulgated in Part 402 is to
implement ESA S 7(a) to (d), 16 U.S.C. S 1536(a) to (d),
dealing with interagency cooperation. It therefore is not
surprising that S 402.01(b) speaks of which office, as
between the USFWS or the NMFS, a "federal agency" should
contact. This language indicates that the drafters did not
have in mind that the regulations would be would be used
by potential litigants to identify the Secretary to whom pre-
suit notice must be provided.

Additionally, the majority fails to consider that a potential
litigant is being encumbered in this way when the full
ramifications of a threat to the environment may not be
fully appreciated. At this early stage, a plaintiff is not likely
to have complete information about all the species affected
by a defendant's conduct or about the manner in which
those species are harmed. Under the majority's holding, a
plaintiff would have to delay bringing suit to enjoin the
"taking" of an endangered or threatened sea turtle species
until it became apparent whether the turtles were being
harmed while on land or in the water. In the mean time,
additional animals could be placed in harm's way and
irreversible environmental damage done.

Indeed, even with the more complete information
developed in this litigation, it is not clear whether the ESA

39

violations plaintiffs complain of with respect to the Sea
Turtles occur while the turtles are on land or in the water.
As the majority concedes, "plaintiffs allege that the housing
project will harm the marine and land habitat of the turtles
. . . ." Majority at 18. Yet, the majority contends that the
harm to the Sea Turtles cannot be viewed as "occurring
solely or primarily on land" because plaintiffs allege that it
is the run-off of sediment from the project site and the
increase in undertreated sewage in Vessup Bay that
threaten the turtles. Id.

The majority's view fails to recognize that the destruction
of the food supplies in the turtles' marine habitat is only
incidental to the harm that will befall them. Plaintiffs have
further alleged that the diminution in the turtles' food
supply will cause them to abandon their traditional nesting
sites on the beaches abutting Vessup Bay where they are
protected under the ESA. The danger according to plaintiffs
is that the turtles will move to "the British Virgin Islands,
. . . a scant 3-4 miles from the project site," where neither
species is protected. Plaintiffs' Appellate Br. at 16. There
the turtles would be subject to harassment and hunting
while on land as well as in the water. Destruction of the

turtles' water habitat is only the indirect mechanism by which this "taking" is effected. And, the regulations are not clear whether the land/water distinction refers only to U.S. territorial lands and waters.

Thus, making the notice requirement dependent on the locale that a particular species occupies at a given moment can give rise to unexpected complications. The fact, however, that harsh results may arise from the application of a mandatory prerequisite to suit is not enough to permit relaxation of those requirements. See, e.g., Torres v. Oakland Scavenger Co., 487 U.S. 312, 318 (1988). Nevertheless, my conclusion that the notice given here was appropriate is not dependent on any unfairness of the result. Instead, it is consistent with the case law on pre-suit notice fashioned by the Supreme Court and by this Circuit.

The majority follows Hallstrom v. Tillamook County, 493 U.S. 20 (1989), insisting that it stands for the blanket proposition that nothing less than full compliance with the

40

notice requirement will permit plaintiffs to proceed with their suit. Majority at 19. This unyielding view of Hallstrom ignores the compelling difference that plaintiffs' supposed procedural default here was not "caused by [the] `failure to take the minimal steps necessary' to preserve their claims." Hallstrom, 493 U.S. at 27-28 (quoting Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 466 (1975)). Rather, it is a product of ambiguities in the statute which require resort to unwieldy regulations.

In Hallstrom, the plaintiffs did not even attempt to provide notice to state and federal agencies even though such notice was clearly required on the face of the citizens suit provision of the Resource Conservation and Recovery Act (RCRA). The RCRA's citizens suit provision unambiguously provided that "no action may be commenced . . . (1) prior to sixty days after the plaintiff has given notice of the violation (A) to the Administrator; (B) to the State in which the alleged violation occurs; and (C) to any alleged violator . . . ." 42 U.S.C. S 6972(b) (1982). The RCRA further conspicuously defined "Administrator" as "the Administrator of the Environmental Protection Agency." 42 U.S.C. S 6903(1). Thus, the statute was clear in specifying to whom pre-suit notice must be directed.

Plaintiffs here, unlike those in Hallstrom, have provided all the notice required by the language of the ESA. Neither the provisions of the ESA nor Reorganization Plan Number

4 of 1970 specify whether the Secretary of the Interior or the Secretary of Commerce should receive pre-suit notice. Only upon resort to the regulations governing "Wildlife and Fisheries," which are nowhere cross-referenced by the notice provisions of the ESA, is it possible to infer which Secretary should receive notice.

Our decision in Public Interest Research Group of New Jersey, Inc. v. Hercules, 50 F.3d 1239 (3d Cir. 1995), is helpful to explain why plaintiffs' suit is not foreclosed. There we construed the notice provision of the Clean Water Act, 33 U.S.C. S 1365(b), and its regulations to determine whether the plaintiffs' notice letter had identified the alleged violations with sufficient particularity to provide the recipient with effective notice. Id. at 1241-42. We expressly relied on the regulations enacted under the RCRA in

concluding that, for the content of the notice letter to be adequate, it must provide "the EPA and the state with enough information to enable them intelligently to decide whether" to initiate an enforcement action, and must give the alleged violator "enough information to be able to bring itself into compliance." Id. at 1249.

My colleagues maintain that Hercules is of no use here since the focus of that case "was on the contents of the notification given." Majority at 21. Indeed, we drew this distinction in Hercules. 50 F.3d at 1249 ("The Supreme Court's focus in Hallstrom was on the timing of the notice, not on its content."). We did so, not as an end in itself, but because there was "no express requirement in the statute pertaining to the content of a notice letter." Id. Under the CWA, Congress has "delegated to the EPA the authority to determine the necessary contents of a notice letter." Id.; see also 33 U.S.C. S 1365(b) ("Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.").

Congress has incorporated into the ESA no such explicit delegation of authority to specify who should receive pre-suit notice. No provision of the ESA commands that a potential litigant look to the regulations promulgated in connection with it to determine which Secretary is to be given notice. Indeed, not even the regulations directly answer this question.

"[A] literal reading of the statute" simply does not command that notification be made to the Secretary of Commerce. Hallstrom, 493 U.S. at 26. Thus, since no relevant statute or regulation has identified without

ambiguity which Secretary is the proper recipient of plaintiffs' pre-suit notice, I do not believe that Hallstrom forecloses plaintiffs' ESA claims on behalf of the Sea Turtles.

II. Preclusive Effect of the First Action

I write on to briefly address an issue that the majority has no need to resolve: whether Judge Finch's factual finding that plaintiffs had "not proved a causal connection between possible harm to Vessup Bay from silt flowing into

42

the Bay" and the temporary housing project was entitled to be given preclusive effect. Hawksbill Sea Turtle v. Federal Emergency Management Agency, 939 F. Supp. 1195, 1210 (D.V.I. 1996) (citing Virgin Islands Tree Boa v. Witt, 918 F. Supp. 879, 904 (D.V.I. 1996)). I believe that it was an abuse of discretion for Judge Brotman to rely upon this factual finding in rejecting preliminary injunctive relief for the Sea Turtles. Judge Finch's factual finding was no more than dictum that followed his conclusions that he was blocked from addressing the merits of the plaintiffs' claims brought on behalf of the Sea Turtles under either the ESA or NEPA.

It is immediately apparent that Judge Finch viewed the claims brought on behalf of the Sea Turtles as not properly before the court. In his recitation of the parties' contentions, Judge Finch noted that he would "not do a full analysis" of plaintiffs' claims brought on behalf of the Sea Turtles since plaintiffs had "failed to allege in their Complaint or Amended Complaint that any harm had occurred or would occur to either species of turtle or to sponges or grasses upon which the turtles feed." Tree Boa, 918 F. Supp. at 892 & n.23. Furthermore, Judge Finch found that plaintiffs' NEPA claim brought on behalf of the Sea Turtles was "not properly before [the] Court" since plaintiffs' Amended Complaint "lack[ed] the degree of specificity that would indicate that a specific claim [was] raised as to these species." Id. at 899-900.

The merits of plaintiffs' ESA claims brought on behalf of the Sea Turtles received no consideration before Judge Finch. He indicated that all of plaintiffs' ESA claims failed to satisfy the notice requirement of 16 U.S.C. S 1540(g)(1)(A). Tree Boa, 918 F. Supp. at 891 & 902. Judge Finch's subsequent discussion of plaintiff's "Section 7" ESA claim, 16 U.S.C. S 1536, omits any reference to the Sea Turtles.3 Virgin Islands Tree Boa, 918 F. Supp. at 902. Plaintiff's "takings" claim brought on behalf of the Sea Turtles, pleaded pursuant to S 9 of the ESA, 16 U.S.C.

S 1538, likewise is not addressed. The very brief

_____

3. This omission certainly was not an oversight since Judge Finch specifically discussed the adequacy of FEMA's consultation with respect to the Tree Boa. Virgin Islands Tree Boa, 918 F. Supp. at 902.

examination of these claims manifests Judge Finch's apparent belief that they had not been specifically pleaded and were not properly before him.

The rule is well settled that "[o]nce a court expresses the view that it lacks jurisdiction, the court thereafter does not have the power to rule on any other matter." Bunker Ramo Corp. v. United Business Forms, Inc., 713 F.2d 1272, 1279 (7th Cir. 1983); Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation, 975 F.2d 683, 687-88 (10th Cir. 1992); In re Newport Harbor Assoc., 589 F.2d 20, 24 (1st Cir. 1978); Stebbins v. Keystone Ins. Co., 481 F.2d 501, 508-09 (D.C. Cir. 1973); American Guaranty Corp. v. United States, 401 F.2d 1004, 1005-06 (Ct. Cl. 1968). But see Crawford v. Zeitler, 326 F.2d 119, 121 (6th Cir. 1964). As one leading treatise has explained,

> [i]f a first decision is supported by findings that deny the power of the court to decide the case on the merits and by findings that got to the merits, preclusion is inappropriate as to the findings on the merits. A court that admits its own lack of power to decide should not undertake to bind a court that does have power to decide.

18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure S 4421 (1981).

The law in this Circuit is in accord. In Smith v. Pittsburgh Gage and Supply Co., 464 F.2d 870, 874-75 (3d Cir. 1972), we stated that the scope of the district court's decision was properly limited to the jurisdictional issue resolved by it even though the district court also decided factual issues on the merits. More recently in Bokunewicz v. Purolator Products, Inc., 907 F.2d 1396, 1399 (3d Cir. 1990), we observed that "everything after the denial of jurisdiction . . . , including the discussion of substantive issues, was dicta, pure and simple."

Even if the alternate bases proffered for the denial of injunctive relief for the Sea Turtles are not treated as jurisdictional in the strict sense, issue preclusion is not appropriate. Judge Finch obviously believed that the

threshold reasons he had provided for denying relief on behalf of the Sea Turtles were dispositive, going so far as to

44

caution that he would not do a full analysis as to the Sea Turtle claims. Virgin Islands Tree Boa, 918 F. Supp. at 892, n.23. This is hardly the sort of "firmness" in a judgment that justifies denying a party a chance to litigate the matter fully in a later action. Thus, Judge Brotman should have permitted plaintiffs a full opportunity to develop the factual elements of their claims brought on behalf of the Sea Turtles. The district court erred in not considering all of the evidence it had before it.

III.

For the foregoing reasons, I would allow the plaintiffs to proceed with their ESA claims brought on behalf of the Hawksbill and Green Sea Turtles. I, therefore, respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit