**PENNSYLVANIA PUBLIC INTEREST RESEARCH GROUP, INC.; Codorus Monitoring Network, Inc.; American Association Inc.; John Klunk; and Thomas Foust, Plaintiffs,**

v.

**P.H. GLATFELTER COMPANY, Defendant.**

**No. Civ.A. 1:CV–99–0940.**

United States District Court, M.D. Pennsylvania.

Feb. 7, 2001.

---

Howard J. Hirsch, David A. Nicholas, Boston, MA, David Bookbinder, American Canoe Association, Inc., Springfield, VA, Paul Boni, Law Offices of Paul Boni, PC, Philadelphia, PA, for Pennsylvania Public Interest Research Group, Inc., Codorus Monitoring Network, Inc., American Canoe Association, Inc., John Klunk, Thomas Foust.

David G. Mandelbaum, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, William H. Gelles, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for P.H. Glatfelter Co.

Bernice I. Corman, U.S. Dept. of Justice, Env. Enforcement Section, Washington, DC, Anne K. Fiorenza, Asst. U.S. Atty., U.S. Attorney's Office, Harrisburg, PA, for U.S.

## MEMORANDUM

RAMBO, District Judge.

Before the court are cross-motions for summary judgment. Defendant seeks summary judgment on all counts while Plaintiffs seek summary judgment on the issue of liability on Counts I, II, III, and IV of their complaint. The parties have briefed the issues, and the motions are ripe for disposition.

### I. Background

#### A. Defendant P.H. Glatfelter Company & Codorus Creek

The following facts are undisputed except where noted. Defendant, P.H. Glatfelter Company ("Glatfelter" or "Defendant"), owns and operates a pulp and paper mill in Spring Grove, York County, Pennsylvania (the "Mill"). The Mill is situated along the Codorus Creek which flows into the Susquehanna River approximately 15 miles downstream from the Mill. Defendant manufactures paper using a bleached kraft process in order to remove the brown color from the wood fiber contained in the paper.

Defendant discharges approximately 14 million gallons of wastewater into the west branch of Codorus Creek daily. The bleaching agents used by Defendant cause a chemical reaction that moves the color molecules from the paper into the wastewater. Plaintiffs contend that there is a discoloration of the Codorus beginning at the mill that is visible all the way downstream through the City of York, located approximately ten miles from the Mill. Plaintiffs claim that this discoloration results from the wastewater discharged by Defendant. (Pl. Statement Undisputed

Facts, hereinafter "Pl. Facts," at ¶¶ 3, 6, 7.) Defendant disputes that any discoloration of the Codorus is caused by the color of the wastewater, that the discoloration begins at the Mill, and that Plaintiffs have established what the "true" color of the stream is. (Def.Resp. to Pl. Facts, hereinafter "Def.Resp. Facts", at ¶¶ 3, 6, 7.)

The color of water is measured in Platinum Cobalt Units ("PCUs"). The Pennsylvania Department of Environmental Protection ("DEP")[1] has established a water quality standard for the Codorus downstream from the Mill whereby the color is not to exceed 50 PCUs.[2] 25 Pa.Code §§ 93.7 & 93.9, Drainage List O. On a daily basis, Defendant measures the color of its wastewater at a discharge pipe referred to as "Outfall 001." Defendant also takes daily measurements of the color of the Codorus approximately 1.25 miles downstream from the Mill. The results of these measurements are recorded on Discharge Monitoring Reports ("DMRs") and submitted to DEP.

### B. *Regulation of Defendant's Wastewater*

In 1965 the Pennsylvania Sanitation and Water Board issued a permit to Defendant authorizing the discharge of industrial waste into the Codorus. This permit imposed no limits on the color of Defendant's wastewater. In 1968 the permit was modified to require, among other things, a limit of 125 PCUs in the stream by June 30, 1975 and 50 PCUs by June 30, 1977 ("1968 Modification"). Defendant appealed the

1968 Modification, and a consent agreement was reached on September 21, 1973 ("1973 Agreement"). The 1973 Agreement required that Glatfelter meet the 1975 and 1977 in-stream PCU limits set by the 1968 Modification (125 PCUs and 50 PCUs, respectively). However, the 1973 Agreement also contained a provision whereby Defendant could petition DEP for an extension on each of these limits if meeting them proved to be technologically impossible. In 1975, 1977, 1979, and 1981 DEP granted Defendant successive two year extensions to achieve the color limits contained in the 1973 Agreement.

Defendant sought further short-term extensions in achieving these color limits on June 30, 1983, November 3, 1983, and February 8, 1984. DEP granted these extensions, the last of which stated that it would continue until "April 30, 1984 or until a final NPDES Permit is issued to P.H. Glatfelter, whichever occurs sooner." (Hirsch Aff., Ex. E.) On April 30, 1984, DEP had still not issued a final permit to Defendant. However, on May 22, 1984, DEP issued Defendant a final NPDES Permit ("1984 Permit").

The 1984 Permit set the following end-of-pipe color limits to be measured from Outfall 001: an average monthly limit of 100 PCUs, an average daily limit of 200 PCUs, and an instantaneous maximum limit of 250 PCUs. (Hirsch Aff., Ex. A at 2.)[3] The purpose of these limits was to ensure that once the wastewater was diluted, the Codorus would meet the in-stream water quality standard of 50 PCUs. The

---

**1.** The agency referred to here as DEP was formerly entitled the Pennsylvania Department of Environmental Resources. While it was so entitled during some of the time periods relevant to this action, this Memorandum refers to the agency as DEP throughout for purposes of continuity and consistency.

**2.** Effluent limits can take two forms. One form of effluent limit is called an "end-of-pipe" limit and measures pollutants from the point of discharge. The other form of effluent limit, an "in-stream" limit, measures the pollutant in the receiving water at a point down-

stream from the discharge site rather than at an outfall pipe.

**3.** These limits are to be measured as follows: (1) "average monthly" is the "total discharge by weight during a calendar month divided by the number of days in the month that the production or commercial facility was operating;" (2) "maximum daily" is "the daily determination of concentration for any calendar day;" and (3) "instantaneous maximum" is the "concentration not to be exceeded at any time in any grab sample." (Hirsh Aff., Ex. A at 3.)

1984 Permit also contained the following language: "Interim effluent limits shall be in accordance with the Consent Agreement approved on September 21, 1973 and subsequent amendments." (Missimer Aff., Ex. B at Part C.5.) DEP provided public notice of the 1984 Permit issuance and solicited public participation, but no public comments or third party appeals were filed.

Defendant petitioned DEP every year from 1984–87 for extensions of time in meeting the in-stream color limitation of 50 PCUs. The 1984 Permit was to expire in 1989, but Defendant made a timely application for renewal, and in September 1989 the Permit was administratively extended. Defendant states that at that time it also began discussions with DEP about various environmental regulatory issues faced by Defendant in hopes of meeting regulatory requirements. Defendant's intent was to implement a modernization project of the Mill at a cost of $160 million, at least in part to reduce color levels in wastewater.

On May 16, 1989, the Environmental Hearing Board ("EHB") approved an agreement entitled "Amended Consent Adjudication" to which Defendant and DEP were the parties ("1989 Adjudication"). EHB provided notice of the 1989 Adjudication in the *Pennsylvania Bulletin* and gave aggrieved parties 20 days to appeal the terms of the 1989 Adjudication. No objections were filed. The 1989 Adjudication purports to amend the 1973 Agreement. (Hirsch Aff., Ex. J at 1.) The 1989 Adjudication sets forth color limits different from those contained in the 1984 Permit. Specifically, the 1989 Adjudication states that no later than July 1, 1994, Defendant was to achieve an annual in-stream color limit of 200 PCUs, a monthly limit of 225 PCUs, and a daily limit of 375 PCUs. These in-stream color limits were to be measured from Martin's Bridge, a point 1.25 miles downstream from the Mill.

The 1989 Adjudication also contains the following:

Nothing set forth in this Amended Consent Adjudication is intended, nor shall be construed, to relieve or limit Glatfelter's obligation to comply with any existing or subsequent statute, regulation, permit or order *except with respect to the discharge of color* from the Facility to the West Branch of the Codorus Creek. ... This Amended Consent Adjudication shall establish Glatfelter's obligations under any statute, regulation, order or permit *with respect to the discharge of color* from [the Mill].

(Hirsch Aff., Ex. J at 10 (emphasis added).)

On September 27, 1989, DEP sent Defendant a letter that stated "[f]or clarification purposes, a revised page 14 b [of the 1984 Permit] is also enclosed to reference the interim color limits for outfall 001 that are in effect as a result of the amended Consent Adjudication dated May 16,1989." (Missimer Aff., Ex. L.) The revision simply states "[i]nterim effluent limits for outfall 001 shall be in accordance with the amended Consent Adjudication dated May 16, 1989." (*Id.*)

The 1989 Adjudication also provided for civil penalties if Defendant failed to comply with the color limits contained therein. Defendant exceeded these limits on three occasions in 1997 and paid civil fines. Furthermore, the 1989 Adjudication required Defendant to do pilot studies on pulp bleaching processes to assist in redesigning the Mill's bleach plant. On March 28, 1991, Defendant submitted reports from its initial pilot studies to DEP. In 1994 Defendant submitted preliminary and final plans for what it contends were "pilot studies of external color reduction technologies." (Def. Statement Undisputed Facts, hereinafter "Def. Facts," at ¶ 32.) Plaintiffs assert that there is an issue of fact as to the nature of the plans submitted. It is Plaintiffs' position that "[t]he preliminary and final plans for pilot studies did not address external color reduction technologies, but rather process

changes." (Pl.Resp. to Def. Facts, herein-after "Pl.Resp. Facts," at ¶ 32.) DEP did not respond to Defendant's submissions, and the plan was implemented.

On June 29, 1995, Defendant sent a letter informing DEP that its study had been terminated on April 30, 1995, because an enzyme treatment resulted in no significant reduction in effluent color. The parties dispute whether DEP actually "approved" the enzyme study. (Def. Facts at ¶ 36; Pl.Resp. Facts at ¶ 36.) The parties are also in disagreement over whether the study constituted an "external color reduction study." Regardless, Defendant did submit a report to DEP on August 30, 1995, regarding a study that it had conducted.

Defendant sent another letter to DEP on June 30, 1995, explaining that it was pursuing other methods for reducing effluent color. Under the 1989 Adjudication, DEP was to review the external color reduction plan submitted by Defendant within 60 days.

Plaintiffs filed suit against Defendant on June 9, 1999. On September 27, 2000, DEP issued Defendant a new NPDES permit ("2000 Permit") which was to go into effect on October 1, 2000. The 2000 Permit imposes end-of-pipe limits on Defendant that are designed to meet the 50 PCU water quality standards in the Codorus. Simultaneous with the issuance of the 2000 Permit, DEP issued an administrative order ("2000 Order") that provides deadlines for Defendant to achieve the designated water quality standards for the Codorus. (Def.Supp.Ex. 2.)[4] The 2000 Order also mandates the submission of various test results and reports by Defendant to DEP.

Finally, the 2000 Order imposes interim effluent limits on Defendant until the time that the final limits are achieved.

On September 14, 2000, Defendant appealed the color limits contained in the 2000 Permit. Defendant also petitioned the EHB for a supersedeas to stay the imposition of the color limits in the 2000 Permit pending the outcome of the appeal. All of the Plaintiffs in the instant action intervened in the supersedeas hearing. A hearing on the supersedeas petition took place on September 27–28, 2000, before Administrative Law Judge Bernard A. Labuskes, Jr. of the EHB. Following the two day hearing, Judge Labuskes granted the supersedeas.[5]

## C. *Plaintiffs' Suit*

Plaintiffs filed the present action on June 9, 1999. Plaintiffs consist of both individuals and non-profit corporations. Plaintiffs reside, work, own property near, and recreate on or near the Codorus Creek. Plaintiffs allege that the discoloration of the Codorus has had the following effects: (1) it impedes efforts to revitalize the City of York along the Codorus; (2) it results in under utilization of the creek for fishing, boating and other wildlife-oriented recreation; (3) it has a continuing detrimental impact on aquatic life in the creek; and (4) it has adversely affected the individual Plaintiffs and members of the Plaintiff organizations who do not recreate or enjoy Codorus as they would absent the discoloration. (Pl. Facts at ¶¶ 8–12.) Defendant disputes these alleged effects insofar as they relate to the wastewater dis-

4. Specifically, if the water quality standard for the Codorus remains at 50 PCUs, Glatfelter must meet this limit on or before December 31, 2007. If the water quality standard for the Codorus is increased to 75 PCUs, Glatfelter must meet the final color limits on or before April 15, 2004. (Def.Supp.Ex. 2 at 8, ¶ A.)

5. In a supplemental brief on the cross-motions for summary judgment submitted on

October 27, 2000, Plaintiffs argued that these proceedings should not be stayed nor should the court abstain from adjudicating Plaintiffs' claims pending the resolution of the 2000 Permit. (Pl.Supp.Br. at 10–12.) Defendant has not sought a stay of these proceedings and has not asserted that abstention is proper, therefore the court need not address the merits of Plaintiffs' argument.

charged by Defendant. (Def.Resp. Facts at ¶¶ 8–12.)

The complaint filed by Plaintiffs contains eight different alleged violations of the Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"), and Pennsylvania's Clean Streams Law, 35 Pa.Stat.Ann. § 691.1 *et seq.* ("CSL"). In Counts I and II, Plaintiffs claim that Defendant has continuously exceeded the daily, monthly, and instantaneous maximums imposed by the 1984 Permit. Counts III and IV contain alternative claims in the event that Defendant is found to be subject to the interim instream limit of 125 PCUs contained in the 1973 Agreement. Plaintiffs contend that Defendant has continuously exceeded the 125 PCU limit in violation of CWA and CSL. Counts V and VI allege that Defendant has violated the CWA and CSL, respectively, by failing to meet their pilot study obligations under the 1989 Adjudication and failing to implement the best demonstrated technology for external color reduction. Finally, in Counts VII and VIII, Plaintiffs contend that if the 1989 Adjudication was validly incorporated as part of the 1984 Permit, then the violations of the agreement described in Counts V and VI constitute violations of the CWA and the CSL. .

## II. *Legal Standard: Motion for Summary Judgment*

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond Proffitt Found. v. U.S. Envt'l. Protection Agency*, 930 F.Supp. 1088, 1096 (E.D.Pa. 1996).

## III. *Discussion*

### A. *Standing*

In their motion for partial summary judgment, Plaintiffs assert that they have standing to bring the present action. (Pl. Br. in Supp.Mot. for Summ.Jud., hereinafter "Pl.Br.," at 25–28.) Defendant disputes this, arguing that Plaintiffs have not established that they have suffered a redressable injury. Because standing is a

constitutional necessity in order for Plaintiffs to pursue their claims, the court will address this as a threshold issue.

■ Article III of the United States Constitution limits the federal courts to hearing actual cases or controversies. The following elements are necessary for an individual to satisfy the case or controversy requirement: (1) plaintiffs must have suffered an injury in fact, (2) there must be a "fairly traceable connection between the ... injury and the complained-of conduct of the defendant," and (3) the injury must be capable of redress by the cause of action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In determining whether these elements are satisfied, courts consider the following: (1) whether the alleged injury falls within the "zone of interests" contemplated by the statute or constitutional provisions; (2) whether the claim asserts concrete questions, as compared to abstract ones that the legislative and executive branches are better suited to answer; and (3) whether a plaintiff is asserting his own legal rights and interests, as opposed to those of third parties.[6] *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130.

In the present action, Defendant argues that Plaintiffs do not have standing to bring the suit because "there is a triable issue of fact as to whether the true color of Glatfelter's discharge has caused any of the aesthetic, apparent color-related conditions of which plaintiffs do complain." (Def.Br. in Opp.Mot.Summ.Jud., hereinafter "Def.Opp.Br.," at 5.) Defendant further asserts that "plaintiffs have failed to establish that their injuries are caused by Glatfelter's discharge of color or that those alleged injuries are capable of redress."

(*Id.* at 7.) In making these assertions, Defendant relies heavily on the affidavit of its expert.

■ The court is unpersuaded by Defendant's arguments. Instead of addressing the threshold issue of standing, Defendant attempts to litigate the case. Defendant's argument fails to recognize that "[s]tanding is established *at the pleading stage* by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action." *Anjelino v. The New York Times Co.*, 200 F.3d 73, 88 (3d Cir.1999) (citations omitted) (emphasis added). Plaintiffs here have set forth specific facts indicating that each element necessary for standing is present.

■ Plaintiffs (or members of Plaintiff organizations) have alleged that their abilities to enjoy and recreate on or near the Codorus Creek are adversely affected by the discoloration of the water. It is well-established that harm to aesthetic and recreational interests is sufficient to confer standing. *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals*, 913 F.2d 64, 71 (3d Cir.1990) (citing *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Middlesex County v. National Sea Clammers Ass'n*, 453 U.S. 1, 16–17, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)).

Furthermore, Plaintiffs have sufficiently stated facts that, if proved, indicate that Defendant's violations of PCU limits caused harm to the Plaintiffs. The "fairly traceable" requirement necessary to confer standing is a lower standard than the

---

**6.** An organization has standing to sue on behalf of its members if (1) the members would have standing in their own right, (2) the interests that it seeks to protect are germane to the associations purpose, and (3) neither the claim or the relief requires the participation of individual members in the suit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Defendant does not challenge the standing of the Plaintiff organizations on any of these bases.

proximate causation necessary to establish a tort claim. *Powell Duffryn,* 913 F.2d at 72, 73, n. 10. Plaintiffs have stated that viewed downstream from the Mill, there is a visible discoloration of the water that begins at the point where Defendant discharges water. (*Compl.* at ¶ 12.) The ,complaint also cites various DEP documentation indicating that the color of the Codorus has had a negative impact on the City of York and the plant life in the Codorus. (*Id.* at ¶¶ 15–16.) Finally, the court agrees that the allegation that "an injunction barring further permit violations will at least partially redress [Plaintiffs'] injury" is sufficient to show redressability. (Pl.Br. at 27.)

As standing is conferred at the pleading stage, and Plaintiffs have adequately alleged that they have concrete and redressable injuries caused by Defendant, the court holds that Plaintiffs have standing to pursue their claims.

### B. *Preclusion*

On October 6, 2000, the court granted Defendant's request for leave to supplement its summary judgment briefs. Defendant contends that the factual findings required for Judge Labuskes's September 29, 2000 grant of the supersedeas on the 2000 Permit limits have preclusive effect on this court. Defendant asserts that Judge Labuskes necessarily had to find that Defendant had not previously been subject to the in-stream limits of 50 PCUs mandated by the 2000 Permit. Defendant's position is that this factual determination is binding on this court and mandates summary judgment in favor of Defendant.

### 1. *Legal Standard: Issue Preclusion*

■ Issue preclusion is the modern term for what has been traditionally referred to as collateral estoppel. *Gregory v. Chehi,* 843 F.2d 111, 115–16 (3d Cir. 1988) (recognizing that courts, including the Supreme Court, have refined the nomenclature of the doctrines of res judicata and collateral estoppel). Issue preclusion is described as follows: "once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *see also Gregory,* 843 F.2d at 116 (holding that issue preclusion "bars relitigation only of an issue identical to that adjudicated in the prior action"). Issue preclusion applies where all of the following elements are met: (1) the issue decided in the prior action is identical to the one presented in the subsequent action; (2) the prior action resulted in a final judgment on the merits; (3) the party or parties against whom issue preclusion is asserted was a party or is in privity with a party to the prior action; and (4) the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the prior action. *Rue v. K–Mart Corp.,* 552 Pa. 13, 713 A.2d 82, 84 (1998); *Shaffer v. Smith,* 543 Pa. 526, 673 A.2d 872, 874 (1996).

Federal courts consistently apply the preclusion doctrines to state court decisions. *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Moreover, "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the state courts." *University of Tennessee v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (internal citation omitted). Plaintiffs do not dispute that if all of the elements of issue preclusion are met, federal and Pennsylvania case law allow for the application of the doctrine where a quasi-judicial administrative body makes the initial findings. *United States v. National Wood Preservers,* No. Civ. A. 84–0458, 1986 WL 12761, at *7 (E.D.Pa. Nov.7, 1986) (declining to grant preclusive

effect to EHB finding because of the lack of identity of issues, not the nature of the decision-making body); *Hebden v. Workmen's Comp. Appeal Bd.*, 534 Pa. 327, 632 A.2d 1302, 1305 (1993) (granting preclusive effect to factual findings of worker's compensation referee).

Plaintiffs' response to Defendant's supplemental brief calls into question the preclusive effect of Judge Labuskes's findings based on two prongs of the issue preclusion test. Plaintiffs' more extensive argument is that the supersedeas order is akin to a preliminary injunction, and as such is not a final judgment on the merits. However, Plaintiffs assert an alternative argument that even if some supersedeas orders may be given preclusive effect, "the supersedeas order at issue here is not sufficiently firm to warrant preclusion." (Pl.Supp. Br. on Summ.Jud., hereinafter "Pl.Supp. Br.," at 8.) Essentially, this argument addresses the fourth prong of the issue preclusion test which requires that the issue must have been fully litigated in the prior action. These arguments will be addressed in turn.

### 2. *Final Judgment on the Merits*

Both Plaintiffs and Defendant argue that a supersedeas action is "akin to a preliminary injunction," and both present their positions with reference to case law addressing the preclusive effect of findings made during preliminary injunction proceedings. (Def.Supp.Br. at 3; Pl.Supp.Br. at 4.) Indeed, the standard that the EHB must apply in granting a supersedeas requires the consideration of the following factors: (1) irreparable harm to the petitioner; (2) likelihood of success on the merits; and (3) likelihood of injury to the public or other parties. 35 Pa.Cons.Stat.

Ann. § 7514(d)(1). These factors mirror the prerequisites required for the issuance of a preliminary injunction in Pennsylvania.[7] *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1282–83 (1992); *John G. Bryant Co. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164, 1167 (1977).

■ Relying heavily on the language in a footnote in *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency*, 126 F.3d 461, 474 n. 11 (3d Cir.1997), Defendant contends that preliminary injunction findings can have a preclusive effect. In response, Plaintiffs assert that "[i]t is well established in Pennsylvania, as elsewhere, that a ruling on a motion for preliminary injunction is merely provisional, not binding on the court or the parties in subsequent proceedings." *Roodveldt v. Merrill Lynch, Pierce, Fenner & Smith*, 585 F.Supp. 770, 776 (E.D.Pa.1984). Plaintiffs further argue that the Third Circuit's willingness to grant preclusive effect to preliminary injunction rulings is limited to successive attempts to obtain the same injunctive relief. (Pl.Supp.Br. at 5.) The Third Circuit did recognize that "preclusion would seem to be particularly appropriate in a second action seeking the same injunctive relief." *Hawksbill*, 126 F.3d at 474 n. 11. Such an application of preclusion principles, however, calls into play principles of claim preclusion rather than issue preclusion.[8]

This court recognizes that Plaintiffs have relied on *dictum* in a footnote in *Hawksbill*. However, this fact does not negate the Third Circuit's unequivocal statement that "findings made in granting or denying preliminary injunctions can have preclusive effect." *Id.* Therefore, the

---

**7.** In addition to the factors necessary for a supersedeas, in the preliminary injunction context Pennsylvania law also requires a showing that the preliminary injunction will restore the status quo. *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1282–83 (1992).

**8.** The doctrine of claim preclusion is far broader than issue preclusion. Claim preclusion bars parties from litigating not only claims that were raised and litigated in a prior action, but also claims that could have been raised, but were not. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466–467 n. 6, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

court will not here hold "as a matter of law that findings made in the course of a preliminary injunction cannot support the application of issue preclusion," the very argument rejected by the Third Circuit. *Id.*

### 3. *Sufficiently Firm*

██ In *Hawksbill*, the Third Circuit discussed the context in which it would apply preclusion principles to preliminary injunction findings. The court stated that such findings can have preclusive effect "if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again." *Hawksbill*, 126 F.3d at 474 n. 11. Determinative factors for whether preliminary injunction findings are sufficiently firm to warrant preclusive effect include "whether the parties were fully heard, whether the court filed a reasoned opinion, and whether the decision could have been or actually was appealed." *Id.* (citing *In re Brown*, 951 F.2d 564, 569 (3d Cir.1991)).

In the present action, the court agrees that the parties were fully heard during the supersedeas action. All Plaintiffs in the present action were granted intervenor status with full participation in the hearing. The parties fully briefed their positions prior to a two day hearing in which they presented evidence and testimony.

██ However, the second factor described in *Hawksbill* is not met in the instant action, and therefore the court will not grant preclusive effect to any findings contained in the supersedeas order. Judge Labuskes specifically states in his order that "[d]ue to the urgency of this matter, a brief explanation must suffice for now." (Def.Supp.Br., Ex. A.) Judge Labuskes did state that Defendant is likely to prevail on the merits because the 50 PCUs limit had never previously been applied. However, he also made it clear that his decision was rendered in a hasty manner under urgent conditions. There is no explanation in the order regarding what evidence or testimony from the hearing supported Judge La-

buskes's findings, nor what legal principles he relied upon. Moreover, no transcript of the hearing is available for this court's review. Without any indication as to the bases for Judge Labuskes's findings, the supersedeas findings are not sufficiently firm to bind this court.

### C. *Counts I–IV*

The disposition of the parties' cross-motions for summary judgment turns on the nature and effect of the 1989 Adjudication as well as the relationship between the 1973 Agreement, the 1984 Permit, and the 1989 Adjudication. Both parties present arguments that contain inconsistencies. Defendant asserts that the 1989 Adjudication "properly *supplanted* the 1984 Permit conditions related to the color" of its wastewater. (Def.Br. in Supp.Mot. Summ.Jud., hereinafter "Def.Br.," at 13 (emphasis added).) Moreover, Defendant notes that "DEP issued a *revision* to the 1984 Permit expressly incorporating the terms of the 1989 Adjudication." (*Id.* at 15(emphasis added).) Finally, Defendant states that the 1989 Adjudication "does *supercede* the 1984 Permit's terms." (*Id.* at 2 (emphasis added).) Defendant emphasizes that the 1989 Adjudication alters its obligations with respect to color from the terms contained in the 1984 Permit. However, Defendant also attempts to convince the court that the 1989 Adjudication is not a "modification" of the 1984 Permit, but instead constitutes an amendment to the 1973 Agreement. Defendant asserts that the 1989 Adjudication amended the 1973 Agreement, and that the 1989 Adjudication finally put to rest Defendant's appeal of the 1968 Modification. Finally, Defendant's position is that the 1984 Permit explicitly anticipated amendments to the 1973 Agreement, and any such amendments were therefore incorporated into the 1984 Permit.

Plaintiffs are also inconsistent with respect to their characterization of the 1989 Adjudication. Plaintiffs argue at length that the 1989 Adjudication modified the

1984 Permit and therefore was subject to federally mandated modification procedures. The crux of Plaintiffs' argument for liability in Counts I–IV is that the 1984 Permit terms apply to color limits, that the 1989 Adjudication was an improperly promulgated attempt to modify the 1984 Permit, and that Defendant is liable for violations of the color limits contained in the 1984 Permit. However, while Plaintiffs would have the court ignore the 1989 Adjudication as the source of color limits for Defendant's discharge, Plaintiffs seek in Counts V–VIII to enforce certain terms of the 1989 Adjudication. Plaintiffs attempt to do this by redefining the 1989 Adjudication as an act of prosecutorial discretion on the part of DEP.

Both the CWA and the CSL make it unlawful to discharge pollutants unless an NPDES permit is issued. 33 U.S.C. §§ 1311, 1342; 35 Pa.Stat.Ann. § 691.1 *et seq.*; 25 Pa.Code § 92.3. A state may "administer its own permit program for discharges into navigable waters" if that program complies with EPA guidelines. 33 U.S.C. § 1342(b). However, EPA has retained certain oversight responsibilities where a state administers its own NPDES program. EPA can withdraw a state's permitting authority, bring individual enforcement actions, and review a state's permitting program. (Amic.Br. at 3.) Permitting states must submit permit applications to EPA, and a permit cannot be issued if the EPA objects in writing. 33 U.S.C. § 1342(d)(1) & (2). In 1978 the EPA approved Pennsylvania's implementation of its own NPDES program. 43 Fed. Reg. 18017 (April 27, 1978).

The citizen suit provision of the CWA allows citizens to commence a civil action against any person alleged to be in violation of effluent limits set pursuant to the CWA. 33 U.S.C. § 1365(a)(1)(A) & (f)(6). A citizen-plaintiff must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v.* *Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Under the CSL, "any person having an interest which may be adversely affected may commence a civil action on his own behalf ... against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." 35 Pa.Stat.Ann. § 691.601(c). The statute of limitations for citizen-suits brought under the CWA is five years. *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 74–76 (3d Cir.1990).

There is no dispute between the parties that the 1984 Permit was properly issued under Pennsylvania's NPDES program. As the 1984 Permit was promulgated pursuant to federal and state requirements, it governs Defendant's color limits for its wastewater. To the extent that the 1989 Adjudication purports to "establish Defendant's obligations with respect to color," it is in conflict with the 1984 Permit. While purporting to amend the 1973 Agreement, the 1989 Adjudication if found to be applicable would necessarily modify the 1984 Permit terms. The 1984 Permit establishes end-of-pipe limits at Outfall 001, requiring Defendant to maintain monthly color limits of 100 PCUs, daily limits of 200 PCUs, and instantaneous limits of 250 PCUs. Under the 1989 Adjudication, 125 miles downstream from the Mill after the Codorus Creek has diluted the wastewater, Defendant is only required to have an annual in-stream color limit of 200 PCUs, a monthly limit of 225 PCUs, and a daily limit of 375 PCUs. These color limits are far more lenient than those contained in the 1984 Permit, and Defendant has been able to continuously comply with the 1989 Adjudication while violating the 1984 Permit. Thus, the court here finds that the 1989 Adjudication did modify, and in fact substantially relax, Defendant's obligations with respect to color.

As the 1989 Adjudication modified Defendant's 1984 Permit, it was necessary

that the proper modification procedures be followed. Modifications to permits must comport with the same procedures as the issuance of an original permit. 40 C.F.R. § 123.25(a)(22) & (25). The applicable federal regulation requires that "[a]ll draft permits prepared by EPA under this section shall be accompanied by a statement of basis or fact sheet, and shall be based on the administrative record, publicly noticed and made available for public comment. The Regional Administrator shall give notice of opportunity for a public hearing, issue a final decision and respond to comments." 40 C.F.R. § 124.6(e) (internal citations omitted). States are permitted to establish their own procedures in lieu of those contained in the federal regulations, but in order to do so, states must "establish requirements *at least as stringent* as the corresponding listed provisions." 40 C.F.R. § 123.25(a) Note (emphasis added).

Pennsylvania has not implemented any regulatory scheme regarding permit modifications, and at least one court in this circuit has held that federal regulations regarding permit modifications are applicable in Pennsylvania. *See Proffitt v. Lower Bucks County Joint Mun. Auth.,* No. 86–7220, 1987 WL 28350 (E.D.Pa. 1987), *rev'd on other grounds,* 877 F.2d 57 (3d Cir.1989). In *Lower Bucks County,* the defendant was sued for violations of its NPDES permit. DEP and the defendant entered into a consent agreement that established "interim, lower effluent limitations in consideration for defendant's promise to meet certain construction schedules for completion of additions to its sewage treatment plant." *Id.* at *1. The District Court for the Eastern District of Pennsylvania held that the permit limits, not the limits contained in the consent agreement, established the defendant's effluent obligations. While the case was reversed on other grounds, this court finds the reasoning persuasive. There, the court noted that the federal modification procedures "support[ ] the general policy of encouraging public participation in the

administration of the NPDES permit program." *Id.* (citing *Costle v. Pacific Legal Foundation,* 445 U.S. 198, 215–16, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980)). Because DEP in that case had not followed proper modification procedures before entering into the consent agreement, the court found that the defendant's obligations had not been altered. *Id.*

The parallels between *Lower Bucks County* and the present action are clear. Defendant here asserts that the color limits contained in the 1989 Adjudication govern its obligations instead of those contained in the 1984 Permit. Furthermore, the consent agreement in *Lower Bucks County* purported to establish interim limits in achieving permit standards, as did the 1989 Adjudication in the case *sub judice.* While the parties in this case do not "agree that this case involves the modification of defendant's original NPDES permit by the ... consent order" as they did in *Lower Bucks County,* the court has held *supra* that the 1989 Adjudication constituted a modification.

The court is also persuaded by the holdings in two circuit court cases which have addressed permit modification procedures. In *United States v. Smithfield Foods, Inc.,* 191 F.3d 516, 523–24 (4th Cir.1999), cert. denied, —— U.S. ——, 121 S.Ct. 46, 148 L.Ed.2d 16 (2000), the Virginia State Water Quality Board (the "Board") and the defendants had entered into an agreement that predated its final NPDES permit. *Id.* at 521. The final permit contained effluent limits that were more stringent than those contained in the previous agreement and order. *Id.* at 522–23. However, the Board had assured the defendants that the agreement would take precedence over the final permit. Moreover, after the final permit was issued, the defendants received extensions from the Board on the compliance schedule contained in the final permit. *Id.*

Like Defendant in the instant action, the defendants in *Smithfield* argued that the

previous agreement was "incorporated into, and therefore took precedence over" the final permit limits. *Id.* at 524. However, the Fourth Circuit affirmed the district court's holding that, "because [the defendants] did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures," the permit terms governed effluent discharge standards. *Id.* The Ninth Circuit came to a similar result in *Citizens for a Better Env't—California v. Union Oil Co. of California*, 83 F.3d 1111, 1119 (9th Cir.1996). There the court held that a state order which contained a compliance schedule and deferred enforcement of permit limits had the "practical effect of modifying the compliance date contained in the NPDES permit" and was subject to modification procedures. *Id.*

In the instant action, no draft permit was issued before the 1989 Adjudication was entered, no fact sheet or statement of basis was made public, and no period for public notice was provided. Absent these procedures, DEP could not modify Defendant's color obligations, and therefore the terms contained in the 1984 Permit apply. As in *Lower Bucks County*, this holding "recognizes the value of public participation in the NPDES permit program." 1987 WL 28350, at *2.

In holding that the 1989 Adjudication was subject to modification procedures, the court here rejects Defendant's position that the EHB may substitute its discretion for that of DEP in this context, and that the notice of the 1989 Adjudication in the *Pennsylvania Bulletin* satisfies any procedural requirements. A permittee may appeal the terms of an NPDES permit by filing a notice of appeal within 30 days of the issuance of the permit. 25 Pa.Code § 1021.52(a). Where an appeal is taken, ERB hears the appeal and has the authority to modify permit terms. 35 Pa.Stat. Ann. § 691.7(a) & (b)(5). Moreover, proceedings before the EHB may be resolved

by a settlement agreement or consent adjudication. 25 Pa.Code § 1021.120(a)(3). At the time of the 1989 Consent Adjudication, the major substantive provisions of such a settlement agreement had to be published in the *Pennsylvania Bulletin,* and aggrieved parties were given 20 days to appeal the agreement. 25 Pa.Code § 21.120(a) (1989).

However, EHB's power to modify a permit that is appealed within 30 days of its issuance is not implicated by the present action. Defendant chose not to appeal the 1984 Permit at the time that it was properly issued. Thus, this is not a situation where "the EHB has [exercised its] authority to substitute its discretion for DEP and to issue an order revising portions of an NPDES permit on appeal." (Def.Br. at 11.) Defendant would have the court accept that the 1989 Adjudication did not address an appeal of the 1984 Permit, but instead an on-going appeal of the 1968 Modification. However, the 1968 Modification involved a pre-NPDES permit, thus it did not implicate EHB's authority to revise "portions of an NPDES permit on appeal." (Def.Br. at 11.) While the 1968 Modification terms remained in effect until the final NPDES permit was issued in 1984, any appeal on that permit would have ceased at the time that the new permit was properly issued. The 1984 Permit supplanted the 1968 Modification when it was properly issued under the new NPDES program. Furthermore, while notice in the *Pennsylvania Bulletin* and opportunity to appeal is sufficient for an EHB determination on a permit appeal, it is insufficient for a modification of a permit which was never appealed by the permittee.

The court is also aware of Defendant's reliance upon the reference in the 1984 Permit to the interim limits contained in the 1973 Consent Agreement. The specific language in the 1984 Permit states: "Interim effluent limits for Outfall 001 shall be in accordance with the Consent Agreement approved on September 21, 1973 and

subsequent amendments." (Def. Ex. C, Part C.5.) Defendant contends that this language "explicitly anticipated the amendment of the 1973 Consent Agreement to establish a more stable, cooperative approach to color control between DEP and Glatfelter, as in fact was embodied in the 1989 Consent Adjudication." (Def.Opp./Reply Br. at 11.) Defendant's position that the 1989 Adjudication governs its obligations as to color hinges upon its position that the 1984 Permit "anticipated" future amendments to the 1973 Agreement that would subsequently be incorporated into the Permit.

Defendant's position that the "subsequent amendments" language contained in the 1984 Permit allowed for the incorporation of the 1989 Adjudication is supported by DEP's act of revising the 1984 Permit. DEP sent a letter to Defendant on September 27, 1989, which included a revision of the 1984 Permit. Section C.5 of the permit was revised to read "[i]nterim effluent limits for outfall 001 shall be in accordance with the amended Consent Adjudication dated May 16, 1989." (Missimer Aff., Ex. L.) The fact that DEP revised the 1984 Permit indicates that the intent of section C.5 was to allow for future amendments to the 1973 Adjudication. While this may have been DEP's intent in including the "subsequent amendments" language, the court here holds that such action cannot be used to circumvent federal modification requirements.

To allow DEP and Defendant to modify the 1984 Permit by including the "subsequent amendments" language would create a loophole in the federal mandate that NPDES permit modifications be subject to strict procedural requirements. *See supra.* The court agrees that to allow such action on the part of DEP "would mean that a NPDES permit, simply by referencing some future, possible, unspecified modification, could gut the permit modification regulations, including those that require an opportunity for public participation in the permitting process." (Pl.Br. at 21.) Thus,

it would be similar to the situation in *Smithfield,* 191 F.3d at 523–24, where the state regulatory body sought to alter the defendants' permit obligations through the issuance of orders and letters that did not meet modification requirements. The Ninth Circuit rejected such a practice, as does the court here. The court therefore finds that the 1989 Adjudication was an improper attempt to modify the 1984 Permit and because proper modification procedures were not followed, the 1989 Adjudication is invalid in its entirety.

There is no issue of fact as to Defendant's color discharge levels. Defendant's DMRs unequivocally show that it has repeatedly exceeded the discharge limits contained in the 1984 Permit. Over the last five years, the relevant statutory period in this action, Defendant has never complied with the monthly limits, and has only rarely complied with the daily and instantaneous limits imposed by the 1984 Permit. (Hirsch Aff., Ex. W (DMRs for April 1994–July 1999)); (Hirsch Aff., Exs. W, Y, Z (summaries of Defendant's DMRs).) Defendant does not contest that it has violated the color limits contained in the 1984 Permit, only that these limits do not apply.

As the court has held as a matter of law that the 1984 Permit establishes Defendant's obligations with respect to color, and there is no issue of fact as to whether Defendant has violated the 1984 Permit color limits, summary judgment on the issue of liability will be granted in favor of Plaintiffs and against Defendant on Counts I and II. Because the color limits contained in the 1984 Permit have been in effect throughout the statutory period, the interim limit contained in the 1973 Agreement does not govern Defendant's obligations with respect to color. Therefore, summary judgment will be granted in favor of Defendant on Counts III and IV.

### D. *Counts V–VIII*

While Counts I–IV deal specifically with color limits, the same reasoning applies to

Plaintiffs' claims in Counts V–VIII. In these counts, Plaintiffs contend that Defendant violated the CWA and CSL by violating certain provisions of the 1989 Adjudication. Specifically, they claim that Defendant failed to submit plans that constitute process modifications rather than external color reduction technology "as required by the relevant provisions of the 1989 Agreement." (Compl. at ¶ 49.) Only Defendant moves for summary judgment on these claims. Defendant asserts that Plaintiffs are not entitled to seek this court's discretion in lieu of DEP's where the issue is approval of pilot studies, external color reduction plans, or ongoing research conducted pursuant to the 1989 Adjudication. (Def.Br. at 17.)

The court will not address the merits of Defendant's argument because the 1989 Adjudication has been found to be invalid in its entirety. As discussed above, when the 1984 Permit was promulgated, any existing disputes regarding the 1968 Modification were extinguished. The court has already held that the subsequent amendments language in the 1984 Permit cannot be used to incorporate future, unspecified actions of DEP into permit obligations.

The 1989 Adjudication purports to amend the 1973 Agreement, and the 1973 Agreement resolved issues contained in the 1968 Modification. Therefore, the 1989 Adjudication is invalid, and any pilot study obligations thereunder are not subject to enforcement by Plaintiffs. Accordingly, summary judgment will be granted in favor of Defendant on Counts V–VIII.

### IV. *Conclusion*

The 1984 Permit was properly issued and establishes Defendant's obligations with respect to the color of its wastewater. To the extent that the 1984 Permit sought to incorporate future amendments to the 1973 Permit, such action violates federal modification requirements. Therefore, the 1989 Adjudication is invalid and has no bearing on Defendant's discharge obligations.

As there is no issue of fact that Defendant is in continuous violation of the color limits contained in the 1984 Permit, summary judgment on the issue of liability will be granted in favor of Plaintiffs and against Defendant on Counts I and II. Furthermore, because the interim limit of 125 PCUs has not been applicable to Defendant during the relevant statutory period, summary judgment will be granted in favor of Defendant and against Plaintiffs on Counts III and IV. Finally, the 1989 Adjudication was not a proper exercise of EHB's authority, and Defendant was never properly subject to studies of external color reduction technology. Therefore, summary judgment will be granted in favor of Defendant and against Plaintiffs on Counts V–VIII.